| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:01-0170** |
| | ) | **JUDGE ECHOLS** |
| **VOCATIONAL GUIDES, INC.,** | ) | |
| **a Tennessee corporation,** | ) | |
| **and TIMOTHY SCOTT JACKSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court is Plaintiff's Motion for Order to Show Cause Why Defendant Timothy Scott Jackson, GIS, Inc., and Dora Helena Ortegon Should Not Be Held in Contempt for Violating the Stipulated Final Judgment and Order for Permanent Injunction and in Support of Motion to Modify the Stipulated Final Judgment and Order for Permanent Injunction (Docket Entry No. 45), to which Timothy Scott Jackson ("Jackson") and Dora Helena Ortegon ("Ortegon") responded in opposition. (Docket Entry Nos. 61 & 69.)

The Court held a show cause hearing on September 12 and 13, 2006. Plaintiff, the Federal Trade Commission ("FTC"), called nine witnesses to testify, including three former employees of GIS, three customers of GIS, two FTC employees and the former program manager of Grants.gov. Jackson and Ortegon also testified. At the conclusion of Plaintiff's case and again at the close of the evidence, the Court denied Ortegon's oral motions for judgment as a matter of law under Federal Rule of Civil Procedure 50. (Show Cause Hr'g Tr. at 270-277, 372-373, hereinafter "Tr."). Following

the hearing, the parties submitted proposed findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. Background

Plaintiff FTC commenced this action on February 20, 2001, when it filed its Complaint for Injunctive and Other Equitable Relief (Docket Entry No. 1) pursuant to Sections 5(a) and 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b). The Complaint alleged that Defendants Vocational Guides, Inc. ("VGI") and Jackson had engaged in deceptive acts in violation of Section 5(a) of the FTC Act in connection with the selling of employment goods and services related to the United States Postal Service. VGI was Defendant Jackson's company. (Tr. at 328; Pl. Exs. 251, 254[1].) The Complaint further alleged that Defendants VGI and Jackson had misrepresented (1) that they were affiliated with the U.S. Postal Service, (2) the availability of postal jobs, (3) that consumers who used VGI's materials were likely to score 90 or above on a Postal Service job application test, and (4) that consumers who used VGI's materials were likely to obtain jobs with the Postal Service.

Ortegon is the former wife of Defendant Jackson. She was married to Defendant Jackson in 1998 shortly after her arrival in the United States from Columbia. (Tr. at 278-79.) They divorced on January 14, 2004. (Tr. at 279; Ex. 214.)

---

[1]Unless otherwise noted, all exhibit numbers refer to Plaintiff FTC's exhibits admitted at the show-cause hearing.

VGI closed its operation as a result of the FTC's lawsuit. (Tr. at 297.) At the time, it was the sole source of employment for Ortegon and Defendant Jackson. Ortegon was employed by Defendant VGI from 1998 until its closure after the filing of the FTC's lawsuit in 2001. (Id.)

During the litigation, Ortegon was deposed by Plaintiff's counsel. To attend her deposition, Ortegon traveled from Nashville, Tennessee, to Washington, D.C. She was represented by counsel at the deposition and met with her counsel before being deposed. (Tr. at 297-298.)

**B. Provisions of the Permanent Injunction**

Plaintiff FTC and Defendants Jackson and VGI agreed to the Permanent Injunction, which the Court entered on July 27, 2001. (Docket Entry No. 36.) The Permanent Injunction included requirements pertaining to (1) engaging in a prohibited business activity, (2) misrepresentation of goods and services, (3) payment of a monetary judgment of $191,600.00 plus any residue from a receivership estate, and (4) monitoring compliance. The provisions of the Permanent Injunction were definite and specific.

As part of the prohibitions on misrepresentation, Paragraph II.A of the Permanent Injunction stated, in pertinent part, the following:

> **IT IS FURTHER ORDERED** that Defendants, in connection with the marketing, offering for sale, or sale of any good or service are hereby permanently restrained and enjoined from:
>
> > A. Misrepresenting the benefit of using the good or service[.]

3

(Docket Entry No. 36 at 4.) The Permanent Injunction defined "Defendants" as "Vocational Guides, Inc., and Timothy Scott Jackson, whether acting directly or through any corporation, subsidiary, division, agent, employee, consultant, independent contractor or other device." (Id.)

The Permanent Injunction also required Jackson to provide copies of the Permanent Injunction to others in defined circumstances. On this subject, Paragraph XI.A of the Permanent Injunction stated the following:

> **IT IS FURTHER ORDERED** that, for a period of five (5) years from the date of entry of this Order, Defendants shall:
>
> A. Provide a copy of this Order to, and obtain a signed and dated acknowledgment of receipt of same from, each officer or director, each individual serving in a management capacity, all personnel involved in responding to consumer complaints or inquiries, and all sales personnel, whether designated as employees, consultants, independent contractors or otherwise, immediately upon employing or retaining any such persons, for any business where such defendant is an officer, director, partner, or majority owner[.]

(Docket Entry No. 36 at 12.) Paragraph XI.B of the Permanent Injunction required Jackson to make the signed acknowledgments available to representatives of Plaintiff upon reasonable notice. (Id.)

Paragraph XII.A of the Permanent Injunction required:

> For a period of five (5) years from the date of entry of this Order, Defendant Jackson shall notify the Commission of the following: . . . (2) any changes in his employment status (including self-employment) within ten (10) calendar days of such change. Such notice shall include the name and address of each business that he is employed by, a statement of the nature of the business, and a statement of his duties and responsibilities in

4

connection with the business or employment; and (3) any proposed change in the structure of any business entity owned or controlled by him, such as creation, incorporation, dissolution, assignment, sale, merger, creation or dissolution of subsidiaries, proposed filing of bankruptcy petition, or change in the corporate name or address, or any change that may affect compliance obligations arising out of this Order, thirty (30) days prior to the effective date of any proposed change[.]

(Docket Entry No. 36 at 13.)

The Permanent Injunction also stated in Paragraph XII.C:

For a period of five (5) years from the date of entry of this Order, upon written request by a representative of the Commission, Defendant Jackson shall submit written reports (under oath, if requested) and produce documents on fifteen calendar days' notice with respect to any conduct subject to this Order[.]

(Docket Entry No. 36 at 14.)

## C.  Jackson Had Actual Notice of the Permanent Injunction

On July 31, 2001, Jackson acknowledged in an affidavit that he had been served with the Permanent Injunction. (Ex. 211.)

## D.  Jackson Operated and Controlled GIS

Grant Information Service Corporation was incorporated on January 20, 2004, in Tennessee by James O. Jackson, father of Timothy Scott Jackson. (Ex. 217 at 131.) On March 29, 2004, Timothy Jackson became the registered agent of the corporation. (Id.) On July 21, 2004, Grant Information Service Corporation changed its name to GIS, Inc. ("GIS").[2] (Ex. 217 at 134-135.) At this point, Helena Ortegon was president and registered agent of the corporation. (Id.) GIS sold information by telephone about

_____

[2]For simplicity, the Court will use "GIS," even though at times exhibits or testimony referred to Grant Information Service Corporation.

obtaining personal grants from the federal government. (Tr. at 184, 207, 245.)

Jackson was an officer of GIS. He held himself out as such before and after the incorporation of GIS, signing as an officer on at least five occasions during a seven-month period from November 2003 to June 2004. On November 11, 2003, he signed the office lease for GIS as its president. (Tr. at 337; Ex. 223 at 718.) Next, on November 14, 2003, he signed an application for a new business tax license from Davidson County, Tennessee, as vice president of GIS. (Tr. at 337; Ex. 218.) Later, on January 16, 2004, he signed the signature card for the checking account of GIS at SunTrust Bank as its vice president. (Ex. 230.) After GIS's incorporation on January 20, 2004, Jackson signed numerous checks on the GIS checking account at SunTrust Bank to pay for advertising, rent, payroll and assorted business expenses of GIS. (Exs. 236, 238.) On March 29, 2004, Jackson signed a filing with the Tennessee Secretary of State as the president of GIS for the purposes of changing the registered agent of the company from his father to himself. (Ex. 217 at 133.) Jackson also wrote a letter to the landlord of GIS on June 17, 2004, signing as president of GIS. (Tr. at 339-340; Ex. 224.)

Jackson controlled GIS at all times. (Tr. at 184-187, 338.) He composed the advertisements of GIS, and he authored and revised the sales script used by GIS telemarketers. (Tr. at 247-250, 367.) Amanda McDaniel, who worked for GIS from February or March 2004 through June 2004, testified that she was hired by Jackson.

6

According to McDaniel, who was the customer service manager, Jackson used the title of "president" and was the boss at GIS. (Tr. at 244-245.) Tim Clay, the office manager at GIS, also reported to Jackson. (Tr. at 186, 246.) In addition, Ortegon, who was the president of GIS from July 21, 2004, until its closing, followed Jackson's orders. On 49 occasions, at Jackson's direction, she wrote checks to "Cash," withdrew funds from the account of GIS, and provided Jackson with the proceeds. (Tr. at 284-286, 290-291, 326-327; Ex. 257.) Even after July 2004, when Ortegon became president, Jackson continued to direct employees, and even ordered the closure of GIS in February 2005. (Tr. at 188, 286, 292, 321.) GIS salesmen Michael Graham and Sean Cornett recognized Jackson as the ultimate authority at GIS during their combined periods of employment at GIS from March 2004 through January 2005. (Tr. at 184-187, 207-208.)

Jackson was also an owner of GIS. In March 2005, he signed two release of liability forms where he identified himself as a previous owner of GIS. (Ex. 227 at 730-731.) GIS telemarketer Sean Cornett testified that during his employment at GIS in the late 2004 and early 2005 he observed Jackson in the office of GIS and was told by Tim Clay, the office manager, that Jackson was the owner. (Tr. at 208.)

**E. Through GIS, Jackson Misrepresented the Benefits of the GIS Grant Information Package**

GIS advertised through classified advertisements in newspapers. Advertisements were placed through Community Newspaper

7

Holding, Inc. ("CNHI") of Birmingham, Alabama. (Ex. 239.) Jackson wrote the advertisements. (Tr. at 367.) For instance, GIS advertisements stated:

> **$25,000 FREE** Cash Grants! 2004! For Personal Bills, School, Business, Etc. Never Repay! Live Operators! $47 Billion Left Unclaimed 2003. 1-800-420-8344 Ext. 26, 7 days.

> **$$ FREE MONEY $$** for 2004! Private-Government Grants for personal bills, school, new business, etc. Never Repay. Live Operators. $47 billion unclaimed 2003. **1-800-420-8344 ext. 01.**

> **AS SEEN ON TV**, $25,000 FREE Cash Grants! GUARANTEED! 2004! For Personal bills, school, business, etc. $47 billion dollars unclaimed 2003. Live Operators. **1-800-420-8331 ext. 02.**

(Ex. 239 at 743-744; Ex. 241.) Jackson also wrote checks to pay for advertisements placed through CNHI. (Ex. 239 at 756, 773.) The GIS advertisements were widely distributed and appeared in newspapers in Texas, Ohio, California, New York, Missouri and Illinois, but advertisements were not placed in Tennessee. (Tr. at 56, 68, 79, 134-138; Ex. 239 at 739, 740, 743-746, 757-762, 774-782, 795, 824). Customers testified that they were attracted to the GIS advertisements because they needed money to pay bills, for college or to start a new business. (Tr. at 56-57, 69, 79.)

Consumers who called the telephone numbers in the advertisements of GIS were connected with telemarketers. The calls came from all states in the nation except Tennessee. (Tr. at 184.) The telemarketers used the sales script written by Jackson and were directed to follow it word for word by Jackson and his office manager, Tim Clay. (Tr. at 192, 367.) The sales script stayed

8

virtually the same during the operation of GIS with occasional small changes made by Jackson or Clay. (Tr. at 192-193.)

FTC employees, posing as consumers, called GIS and recorded two sales presentations. (Tr. at 46-49, 149-152.) The sales pitch in each call was similar. (Exs. 201-202, 242-243.) One of the FTC employees was first connected to a pre-recorded message, which stated: "Every year in cities across America, the government is giving away over $360 billion in free cash grants" and "people just like you will be receiving free cash grants from the government." (Ex. 202 at 688-689.)

Once connected, the GIS telemarketers began by stating they had some questions to see if "you [the caller] qualify." (Ex. 202 at 689; Ex. 243 at 1352.) The telemarketers then asked if the caller was a taxpayer and U.S. citizen with a credit card or checking account. (Ex. 202 at 689; Ex. 243 at 1352.) When the caller affirmatively answered these questions, the telemarketers said that, when the caller received an "application package," GIS would show the caller exactly how to apply for free government and private grants for housing, rent, personal bills, school, a new business, or "pretty much for any good cause." (Ex. 202 at 690; Ex. 243 at 1353.) The telemarketers also told the callers that because they were U.S. citizens and taxpayers, they were "automatically entitled" to the money. (Ex. 202 at 692; Ex. 243 at 1354.)

In addition, the telemarketers explained that GIS would show the consumers how to submit applications and proposals to the proper government agencies. (Ex. 202 at 691; Ex. 243 at 1354.)

9

After stating the price of the grant package ($169.90 in one call and $139.90 in the second), the telemarketers said that if the caller did not receive "at least $25,000" in grant money within 90 days a refund would be given. (Ex. 202 at 694; Ex. 243 at 1354-1355.) To close the deal the telemarketers asked whether the callers would "like to register today" by check or credit or debit card. (Ex. 202 at 696; Ex. 243 at 1357.)

Customers of GIS from Texas and Ohio testified that the sales script used by GIS telemarketers guaranteed that, if customers did not receive a grant of $25,000 within 90 days with the GIS grant package, they would receive a refund. (Tr. at 190-191, 210, 251; Exs. 202 at 694, 206, 243 at 1354.) Potential customers were also told that they were automatically entitled to receive grants by being citizens and taxpayers. (Ex. 202 at 692; Ex. 243 at 1354; Tr. at 193-194.) The script also stated that grants could be used to pay bills and for any good cause. (Tr. at 57, 194, 210.)

These customers also testified that GIS represented in writing they were guaranteed to receive a grant of $25,000 if they used the grant materials. (Tr. at 57, 60-61, 63-64, 69, 72, 77.) The form cover letter and the written guarantee included in the GIS grant information package sent to customers stated the following: "As stated to you when you ordered, we guarantee that if you use our program you will qualify for at least $25,000 within the 90-day trial period or we will refund to you the cost of the package." (Tr. at 190-191, 252; Exs. 246-247, 204, 206-207.)

10

Rebecca Spitzgo, the former program manager of Grants.gov, testified about the availability of grants through agencies of the United States government. (Tr. at 214-215.) Grants.gov is a website that is operated by the U.S. Department of Health and Human Services, providing information about all federal government grants. (Tr. at 216-217.) The website features over 26 federal grant-making agencies which award $400 billion a year. (Tr. at 217.) Grants.gov includes information regarding the eligibility requirements for grants listed there. (Tr. at 219.) Spitzgo was the program manager of Grants.gov from April 2004 to May 2006 and led the initiative to operate the website. (Tr. at 215.) Prior to that, she was the deputy program manager from June 2002 to April 2004. In addition to working at Grants.gov, Spitzgo has over twenty-five years of experience working with government grants at the Department of Education and the Health Resources and Services Administration. (Tr. at 217-218.)

According to Spitzgo, the vast majority of federal grants are available to states, academic institutions, local governments, school districts, non-profit organizations, and tribal organizations as opposed to individuals. (Tr. at 220.) Typically, individuals unaffiliated with such organizations are not eligible for grants. (Tr. at 220-222.) For example, in August 2006, about three percent of the approximately 1700 currently available grants (about 51) listed on Grants.gov were available to individuals. (Tr. at 219-220, 239.)

Spitzgo also testified that government grants are awarded through a competitive application process, and applications for grants are often substantial written submissions. (Tr. at 227, 229.) As a result, not everyone who applies for a specific grant receives the grant because applicants may not be eligible for the grant, or there may not be sufficient funds for all applicants who are eligible. (Tr. at 227-228.)

Spitzgo further testified that being a United States citizen and taxpayer did not automatically entitle a person to receive a grant from the United States government. (Tr. at 230-231.) She also testified that there are restrictions on the uses that can be made of government grants, which are spelled out in the legislation and regulations which create and regulate the grant programs. (Tr. at 226.) Such restrictions limit who can qualify for grants. (Id.) In addition, Spitzgo testified there were no federal grant programs for starting most ordinary businesses or for paying personal bills. (Tr. at 224-225, 231.) Spitzgo's testimony regarding the nature and availability of government grants and specifically their availability to individuals was credible and authoritative.

Jackson testified that the Eligibility Index of the Catalog of Federal Domestic Assistance ("CFDA") identified 643 grants for individuals. (Tr. at 326.) A copy of the Eligibility Index of the CFDA was part of the GIS grant materials. (Tr. at 326; Ex. 249 at 520-545.) The CFDA includes fifteen types of federal assistance including grants. (Tr. at 229-230.) While the Eligibility Index of the CFDA does include approximately 643 programs designated as

12

available to individuals, many of those assistance programs are forms of assistance other than grants as clearly indicated by a lettered code, the legend for which is in the paragraph of the first page of the Eligibility Index. (Ex. 249 at 520-545.) In addition, the CFDA includes current as well as closed grants for which there are no remaining funds. (Tr. at 230; 253-254.) As a result, it is not apparent what portion of the grants listed in the CFDA were current and thus available to applicants. During his testimony, Jackson did not identify any grants available to customers to pay their personal bills or to use for a new business as had been represented by GIS, nor did he identify any grants which were automatically available to customers because they were citizens and taxpayers as was also represented by GIS. In comparison, Spitzgo testified such grants did not exist.

The three GIS customers who testified at the hearing about their purchases and use of the GIS grant materials were unable to find grants for which they would qualify even though they made diligent efforts to use the materials. (Tr. at 62-63, 74-75, 81-82.)

Amanda McDaniel, former customer service manager of GIS, testified that the GIS grant package requested that customers contact GIS to relate their success stories about obtaining government grants. (Tr. at 253; Ex. 205 at Step 8.) Although McDaniel spoke to at least fifty customers each day, she never received a call from a customer who received a grant. (Tr. at 252-253.) McDaniel was also not aware from any source that customers

13

of GIS received grants. (Id.) Similarly, while Sean Cornett, a GIS salesman, spoke with customers who were seeking help in using the GIS grant materials, he never spoke with a customer who had received a grant. (Tr. at 211.)

Rather than reporting success, calls to GIS customer service included calls from customers who could not find a grant for which to apply. (Tr. at 252.) The nature of calls to GIS customer service was discussed at office meetings and was known by GIS office staff including Jackson. (Tr. at 249, 252-253.)

Jackson testified that he had financial difficulties and filed a bankruptcy petition in October 2005. Despite this, he did not apply for a grant, even though he represented through GIS that government grants were available to pay personal bills, and that citizens and taxpayers were automatically entitled to the grants. (Tr. at 367-368.) Likewise, telemarketer Michael Graham, who worked for GIS for nine months and repeated the sales script approximately one hundred times daily, did not apply for a government grant. (Tr. at 185, 193, 197.) The failure of these insiders to apply for grants being touted as automatically available to citizens and taxpayers shows they did not believe the claim.

Through GIS, Jackson represented that (a) customers of GIS who used the grant information package were highly likely to receive a grant of at least $25,000 within 90 days, (b) U.S. taxpayers and citizens were automatically entitled to receive grants from the government, and (c) government grants were available to pay personal bills and for ordinary businesses. These representations

14

grossly misrepresented the availability of government grants to individuals and the benefit of using the GIS grant information materials to apply for such grants. Through the widely distributed advertisements of GIS and its nationwide telemarketing, Jackson made these misrepresentations as a consistent practice during his operation of GIS from February 2004 through February 2005. These representations were material and central to the benefit of using the GIS grant materials.

Another misrepresentation related to the nature of the money-back guarantee. GIS telemarketers orally represented to customers that if they did not receive a grant of at least $25,000 within 90 days, they would receive a full refund by returning the grant information package. (Ex. 202 at 694; Ex. 243 at 1354.) No other conditions were stated. In contrast, the written form guarantee sent with the GIS grant package indicated that a customer must submit one to three letters of denial from grant agencies before receiving a refund. (Tr. at 324, 364; Exs. 204, 247.) Fulfilling the requirements of the written guarantee of GIS required a substantial investment of time by customers. (Tr. at 366-367.) The condition of requiring denial letters for a refund was not previously disclosed to customers. It created a substantial impediment to seeking a refund under the written guarantee. As customers testified, they were stymied in applying for grants because they could not locate any grants for which they qualified, and if they did not apply for grants, they could not satisfy the

15

conditions for a refund under the written guarantee. (Tr. at 67, 82-83.)

In addition, the refund offered by GIS in writing was not a full refund. It was a refund less $10 for shipping and handling. (Tr. at 210, 366; Exs. 204, 247.)

GIS ceased operation in February 2005 after selling grant packages to 27,000 customers. (Tr. at 286, 331, 365; Ex. 226.) In 2004, GIS had gross sales of $2,667,861.07, refunds of $304,129.49, and net sales of $2,363,731.58. (Ex. 253 at 2.) In 2005, when GIS operated for approximately six weeks, GIS had gross sales of $460,335.95, refunds of $42,716.27, and net sales of $417,619.68. (Tr. at 357-358; Ex. 265 at 1.) Thus, in 2004 and 2005, GIS had total gross sales of $3,128,197.02.

By July 21, 2004, when Ortegon became president, GIS already had gross sales of $650,000 (Tr. at 102; Ex. 219 at 2), which was 20.8 percent of the total gross sales during the entire operation of GIS. Over the course of its operation, GIS refunded about eleven percent of its gross sales, resulting in total net sales of $2,781,351.26. GIS had profits of at least $367,000 in 2004 and $32,845.01 in 2005. (Tr. at 320; Ex. 265 at 2.) Jackson admits that he withdrew the 2004 profits from GIS. (Tr. at 358.)

**F. Ortegon Acted in Concert With Jackson and GIS**

A Columbian native, Ortegon entered the United States in 1998 and married Jackson shortly thereafter. They divorced on January 14, 2004, but they were living together again in July 2004. (Tr. at 280-281.) On July 8, 2004, Ortegon legally changed her

16

married name, Dora Helena Jackson, to her maiden name, Dora Helena Ortegon. (Ex. 215.) Although she may not have been able to speak English fluently in mid-2004, she could read, speak and understand English well by that time. Ortegon learned to speak English fluently by the summer of 2005.

After her name change, Ortegon became the president and owner of GIS on July 21, 2004, at Jackson's request. (Tr. at 284, 294; Ex. 217 at 134-137.) Ortegon did not pay any money to become the owner of GIS. (Id. at 294.) Instead, Jackson promised to pay Ortegon's $2,900 credit card debt if she would allow transfer of the company into her name. (Id.) This was not a bona fide sale of the company. In addition to assuming the title of "president" at GIS, Ortegon's duties included data entry, filing and compiling grant information packages for mailing. (Tr. at 282-283, 330.)

According to Ortegon, Jackson requested that she become the president and owner of the company because the Better Business Bureau was reporting that Jackson was the owner of GIS and also reporting that VGI, his former company, had problems. Jackson explained to her that he did not want customers to know about the problems he had at VGI because, if customers knew, they would not buy grant information packages. (Id. at 283-284, 295-296.) As a result, he wanted to hide his involvement in GIS from the Better Business Bureau and the public. (Id. at 283-284, 295-296, 356.)

After becoming president, Ortegon signed documents on behalf of GIS and allowed Jackson to retreat into the shadows. On July 21, 2004, Ortegon signed an amendment to the charter of GIS as

president that was filed with the Tennessee Secretary of State changing the name of GIS. (Ex. 217 at 134-135.) Attached to this amendment to the GIS charter was a document signed by Ortegon as president of GIS, identifying herself as the sole shareholder and director of GIS. (Ex. 217 at 136-137.) Although Ortegon signed these documents, Jackson retained control of GIS. (Tr. at 283, 331.)

Also on July 21, 2004, Ortegon signed an application for a new business tax license in the new name of the corporation, GIS, Inc., that was submitted to the Clerk's Office of Davidson County, Tennessee. (Ex. 220.) On July 22, 2004, Ortegon became the sole signatory on the checking account of GIS at SunTrust Bank. (Ex. 230 at 148.) Subsequently, she signed numerous checks on the account for various purposes, including to pay for rent, advertising, payroll, telephone service, payroll taxes, and copies. (Exs. 235, 237.) Ortegon also wrote 49 checks on the GIS bank account at SunTrust Bank payable to "Cash," which ranged in date from July 23, 2004, through February 22, 2005, and which totaled $318,898. (Ex. 257.) Ortegon obtained currency from SunTrust and gave it to Jackson at his direction. (Tr. at 285-286, 290-291, 326.) Although Jackson was no longer a signatory on the GIS account at SunTrust, he continued to control its funds through Ortegon.

Ortegon worked in the GIS office from July 2004 to February 2005 and received a salary of $3,000 per month, paid in cash, from Jackson (which amounted to approximately $21,000 for the seven-month period). (Tr. at 291-292.) After the closure of GIS,

18

Ortegon also received a $20,000 refund from Intelephones that was deposited into her personal bank account. (Tr. at 288-289.) Intelephones had held this amount of GIS funds for six months as a reserve against customer refunds. (Id.) With Jackson's permission, Ortegon used $15,494 of the $20,000 to pay off indebtedness on her automobile. She gave $4,506, the remainder of the $20,000, to Jackson. (Id. at 289.)

## G.  Ortegon Had Knowledge of the Permanent Injunction

While Ortegon denies personally receiving the Permanent Injunction (Tr. at 282), she had knowledge of it. As detailed above, Ortegon was familiar with the FTC's litigation with her husband and Defendant VGI, her employer at the time.

During 2001, Jackson told Ortegon of the entry of the Permanent Injunction. (Tr. at 298, 300.) She was also aware that, in order to pay a money judgment imposed by the Court, her husband obtained a mortgage upon their home. (Id. at 299.)

From July 2004 through February 2005, Ortegon was at the office of GIS virtually every workday. (Tr. at 304-305.) During that time, approximately 100 employees of GIS signed acknowledgments that they had been informed of Jackson's litigation with the FTC and of the fact that the Permanent Injunction was posted on two bulletin boards in the office for their review. (Ex. 251). Copies of the Permanent Injunction were posted on two bulletin boards in the office of GIS. (Tr. at 194-195, 314.) Ortegon saw the Permanent Injunction posted on the wall in the GIS office. (Tr. at 304.) She understood that the Permanent

19

Injunction required its posting in the GIS office. (<u>Id.</u> at 303.) She also knew the Permanent Injunction made it necessary for employees of GIS to sign acknowledgments of receipt of the Permanent Injunction. (<u>Id.</u> at 303-304.) Despite this understanding, Ortegon did not sign such an acknowledgment. (<u>Id.</u> at 304.) Ortegon admits that as president of GIS it was her duty to ensure that the company operated lawfully. (Tr. at 305-306.)

Ortegon had ample reasons and opportunities to examine the Permanent Injunction, although she denies she ever did. (Tr. at 282.) Her denial is self-serving and not credible, especially in light of the suspicious circumstances under which she agreed to become president of GIS. Based on a multitude of facts including Ortegon's employment at GIS and Defendant VGI, her marriage and close alignment with Jackson, and her admissions that she knew of the entry of the Permanent Injunction, knew some of its terms, and even saw it posted in the office at GIS, there is clear and convincing evidence from which the Court finds she had knowledge of the Permanent Injunction and its prohibitions.

## H. Jackson Failed to Obtain Signed Acknowledgments of Receipt Before April 21, 2004

Jackson was an officer of GIS from its initiation until he installed Ortegon as president of GIS during July 2004. GIS opened for business on November 15, 2003, according to its application for a new business tax license with Davidson County, Tennessee, and was running newspaper advertisements regarding grants as of February 22, 2004. (Exs. 218, 239 at 739-741.) GIS was selling

20

grant information catalogs by March 2004. (Tr. at 70, 175-176.)
Bank records for the GIS checking account at SunTrust show deposits
of over 150 checks from the sale of grant information catalogs into
the account of GIS during March 2004. (Tr. at 125; Exs. 231-234.)

In a letter dated April 25, 2005, counsel for the FTC
requested that Jackson make available to the FTC all original
signed acknowledgments of receipt as required by Paragraph XI of
the Permanent Injunction. The letter quoted Paragraph XI in its
entirety and enclosed a copy of the Permanent Injunction. (Ex.
250.)

In his letter dated May 24, 2005, Jackson acknowledged receipt
of the FTC's letter of April 25, 2005, and stated that in response
to the request for all acknowledgments of receipt he was enclosing
the original acknowledgments as requested. (Ex. 251.) There were
over 100 acknowledgments enclosed with his letter, and their dates
ranged from June 1, 2004, through February 2005. (Tr. at 165, 171.)
After receiving these acknowledgments, the FTC asked Jackson to
confirm that he had provided all acknowledgments as requested.
(Ex. 252.) In his response, dated June 16, 2005, Jackson confirmed
that he had provided all the signed acknowledgments of receipt.
(Ex. 253.)

After the filing of the Plaintiff's motion to show cause, on
December 21, 2005, Jackson through his counsel provided the FTC
with copies of additional acknowledgments of receipt of the
Permanent Injunction that were dated April 21, 2004, through
May 26, 2004. (Ex. 254.) Because Jackson did not provide the FTC

21

with any acknowledgments of receipt of the Permanent Injunction for the period prior to April 21, 2004, Jackson apparently did not obtain signed acknowledgments from employees before that date.

## I. Jackson Failed to Report His Employment With GIS

According to the records of Plaintiff, Jackson reported his employment to Plaintiff on only two occasions, and he did not disclose any connection to GIS prior to May 2005. (Tr. at 88-90; Exs. 212-213.) Jackson became employed by GIS in November 2003 when he applied for a business tax license and signed a lease on its behalf. (Exs. 218, 223.) Jackson did not report his employment with GIS to Plaintiff within ten days of becoming employed as required by Paragraph XII.A of the Permanent Injunction.

Jackson testified that he wrote a letter, dated June 15, 2004, to Plaintiff reporting that he was the registered agent of GIS. (Tr. at 312; Def. Ex. 1.) He also claimed that a U.S. Postal Service Domestic Return Receipt received by him confirmed his claim that his letter of June 15, 2004, was received by Plaintiff. (Tr. at 346-348; Ex. 263 at 2.)

Jackson had previously submitted the domestic return receipt in question as an exhibit to a sworn affidavit to this Court where he made the same assertion. (Tr. at 346-348.) In the exhibit to his affidavit, Jackson wrote beside the image of the domestic return receipt the following: "This is the certified card that supports my compliance." (Id. at 347; Ex. 263 at 2.) The domestic return receipt in question was addressed to Plaintiff in

22

Washington, D.C., but it did not show a recipient's signature. (Ex. 263 at 3.) On the reverse side of the domestic return receipt, the sender's return address appeared as follows: "GIS, 5543 Edmondson Pike, Ste. 184, Nashville, TN 37211." (Ex. 263 at 3.)

This address was a mailbox at a UPS Store located at 5543 Edmondson Pike in Nashville, Tennessee, that was applied for on July 13, 2004. (Ex. 240 at 1308.) Because GIS did not apply for this mailbox until July 13, 2004, the domestic return receipt in question could not have been sent with the letter as Jackson claimed. (Tr. at 349-351.) The return address of GIS that Jackson wrote on the domestic return receipt did not exist until nearly a month later. Because Plaintiff has no record of receiving Jackson's letter of June 15, 2004 and in light of the falsity of Jackson's testimony regarding the domestic return receipt, Jackson's claim that he sent the letter to Plaintiff is not credible.

## J. Jackson Failed to Truthfully Report the Nature of His Relationship with GIS when the FTC Asked Him To Do So

By letter dated June 7, 2005, counsel for the FTC requested pursuant to Paragraph XII.C of the Permanent Injunction that Jackson prepare a written report under oath explaining his relationship with GIS. (Ex. 252.) Acknowledging receipt of the letter, Jackson replied in an unsworn letter, dated June 16, 2005, that, other than being a registered agent from March 21, 2004 to July 31, 2004, he "was not a Officer, Director, Partner or Majority

23

Owner" of GIS. (Ex. 253.) His denial that he was an officer was false.

Jackson attempted to hide the extent of his involvement with GIS on other occasions. For example, on March 30, 2004, Jackson wrote to the Better Business Bureau ("BBB") to introduce GIS and submit a completed business questionnaire. (Tr. at 353; Ex. 264.) Jackson signed the letter as "Tim Scott" and did not reveal his last name. (Tr. at 354; Ex. 264.) The attached questionnaire identified his father, James O. Jackson, as president of GIS. (Ex. 264.) In contrast, on the preceding day, Jackson had signed a change of registered agent notice that was filed with the Tennessee Secretary of State as president of GIS. (Ex. 217 at 133; Tr. at 355-356.) After the BBB began reporting that Jackson was associated with GIS, Jackson recruited Ortegon to take on the role of president and owner of GIS in order to hide his involvement with GIS.

Jackson also did not disclose his relationship with GIS when he filed a petition for relief under Chapter 7 of the U.S. Bankruptcy Code. As a supporting document to his petition, Jackson submitted a statement of financial affairs, which required disclosure of "all businesses in which the debtor was an officer" or owner of five percent or more of the business within the prior six years. (Ex. 262 at 5.) Jackson did not disclose his relationship with GIS even though the statement of financial affairs was submitted under penalty of perjury. (Tr. at 344-345; Ex. 262 at 7.) Jackson's false denial to Plaintiff that he was an

24

officer of GIS was simply part of his plan to conceal his commanding role at GIS.

## II.  CONCLUSIONS OF LAW

There is no dispute that the Court has subject matter jurisdiction of this case, as well as jurisdiction over the parties, along with Ortegon and GIS, Inc.  Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b) and (c).

**A.   Legal Standard for Civil Contempt**

A decision on a motion for contempt lies within the sound discretion of the Court.  See Electrical Workers Pension Trust Fund of Local Union #58 v. Gary's Elec. Serv., 340 F.3d 373, 378 (6th Cir. 2003).  While the contempt power should not be used lightly, the power "'is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed'" by law. Id. (quoting Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450 (1911)); Shillitani v. United States, 384 U.S. 364, 370 (1966).  Contempt proceedings are used to "enforce the message that court orders and judgments are to be complied with in a prompt manner." Id.

To establish civil contempt, a movant must show by clear and convincing evidence that (1) a party failed to comply with a definite and specific court order, and (2) the party had knowledge of the court order. Gary's Electric Service Co., 340 F. 3d at 379; Rolex Watch USA v. Crowley, 74 F.3d 716, 720 (6th Cir. 1996); N.L.R.B. v. Cincinnati Bronze, Inc., 829 F.2d 585, 591 (6th Cir.

25

1987).  To prevail on a civil contempt claim, the movant is not required to establish intent or willfulness.  <u>Rolex Watch USA</u>, 74 F.3d at 720.  Once this prima facie showing of a violation is made, the burden then shifts to the alleged contemnor who must "'categorically and in detail' show why he or she is unable to comply with the court's order." <u>Rolex Watch USA</u>, 74 F.3d at 720.

**B.  Jackson Failed to Comply with a Definite and Specific Order of This Court of which He Had Actual Notice**

The Permanent Injunction was a definite and specific court order entered on July 27, 2001.  Jackson had actual notice of it because he signed it and he acknowledged service of a finalized copy of it upon him on July 31, 2001.

Despite Jackson's stipulation to the terms of the Permanent Injunction and his acknowledgment of service, Jackson failed to comply with four provisions of the Permanent Injunction, Paragraphs II.A., XI.A, XII.A, and XII.C.  Plaintiff has established Jackson's contempt of these four provisions of the Permanent Injunction through clear and convincing evidence.

> *1.  Jackson Violated Paragraph II.A of the Permanent Injunction by Misrepresenting the Benefit of the Grant Package Sold through GIS*

Paragraph II.A. of the Permanent Injunction prohibited Jackson from misrepresenting the benefit of using any good or service when marketing, offering for sale, or selling such good or service.  The prohibition also extended to Jackson making misrepresentations through a corporation, employee or agent.

26

Jackson violated Paragraph II.A of the Permanent Injunction through his operation of GIS by misrepresenting to customers the benefits of using the GIS grant information package. Newspaper advertisements written by Jackson and placed by GIS across the country enticed consumers to contact GIS telemarketers by guaranteeing free grant money that would not have to be repaid. These advertisements failed to include any reference to a refund that GIS would pay to the consumer in the event a grant was not obtained by using GIS's grant package.

The GIS telemarketer script written by Jackson and used word for word by GIS telemarketers represented that (1) customers who used the GIS grant information package were highly likely to receive a grant of at least $25,000 within 90 days, (2) taxpayers and citizens of the United States were automatically entitled to receive grants from the government, and (3) government grants were available to pay personal bills, to start businesses, and for any other "good purpose."

These statements grossly misrepresented the availability of government grants to individuals and the benefit of using the GIS grant information materials to apply for such grants. (Id.) From February 2004 to February 2005, Jackson made these misrepresentations through GIS as a consistent practice. (Id.)

The misrepresentations made by GIS are attributable to Jackson because he controlled all aspects of the operation of GIS. He wrote its telemarketing sales script, wrote its print advertisements, controlled its finances, installed Ortegon as its

27

president, supervised its office manager, and was the ultimate authority at GIS.

Jackson contends that GIS did not misrepresent the benefit of using its product because there are government grants available to individuals and GIS customers who called in response to print advertisements were told before they purchased a grant information package that they were guaranteed to receive a grant of at least $25,000 within 90 days <u>or</u> they were entitled to a full refund of the purchase price of the grant information package, minus shipping and handling. Thus, Jackson contends that GIS guaranteed a refund, not the receipt of a grant, and he points to evidence showing that GIS granted refunds to all consumers who asked for them, including $304,129.49 in refunds in 2004 alone.

The Court rejects these contentions. Paragraph II.A of the Permanent Injunction prohibited Jackson from misrepresenting the benefit of goods or service he marketed, offered for sale or sold through any corporation or agent. The Permanent Injunction did not include an exception that allowed Jackson to misrepresent goods simply because they were sold with a money-back guarantee.

In addition, the argument that offering a money-back guarantee somehow makes the falsity of an advertisement irrelevant "has been repeatedly rejected," and the Court rejects it here. <u>FTC v. Think Achievement Corp.</u>, 312 F.3d 259, 261 (7th Cir. 2002) (citing <u>Montgomery Ward & Co. v. FTC</u>, 379 F.2d 666, 671 (7th Cir. 1967); <u>FTC v. Pantron I Corp.</u>, 33 F.3d 1088, 1103 (9th Cir. 1994); <u>FTC v. SlimAmerica, Inc.</u>, 77 F.Supp.2d 1263, 1273 (S.D. Fla. 1999)). As

28

Judge Posner has observed, "[n]o one would buy something *knowing* that it was worthless and that therefore he would have to get a refund of the purchase price." <u>Think Achievement Corp.</u>, 312 F.3d at 261 (emphasis in original).

Seeking a refund is bothersome, and it requires time and effort. <u>See</u> <u>id.</u> "[T]here are many circumstances in which consumers who have been materially misled by deceptive advertising may, upon discovering the deception, be unable to obtain any effective redress whatsoever through the money-back guarantee." <u>In the Matter of Sears, Roebuck and Co.</u>, 95 F.T.C. 406, 518 (1980), *aff'd*, 676 F.2d 385 (9th Cir. 1982).

In this case, the written conditions of the GIS money-back guarantee required the consumer to return the grant information package along with one to three denial letters from grant agencies. In order to obtain a denial letter, the customer was required to apply for a grant, and the evidence shows grant applications often require substantial written submissions. Jackson conceded that complying with the written guarantee would require a substantial investment of time, and he testified that GIS policy was to provide refunds to consumers who requested them even if the consumers did not provide denial letters. GIS advertisements, sales scripts, and written materials, however, did not apprize consumers of this policy and inform them that they could obtain a full refund even without submitting denial letters.

Jackson also points to evidence that there were few complaints about GIS made to the BBB. (Tr. at 331.) This evidence does not

29

rebut the clear and convincing evidence presented by the FTC that Jackson, through GIS, misrepresented the grant information package. The meaning of a lack of complaints to the BBB is indeterminate. Cf. United States v. Lasseter, 2005 WL 1638735 at *4 (M.D. Tenn. 2005) ("[F]ailure by consumer victims to file a complaint with the FTC does not indicate that the Defendant has complied with the [FTC] Act.") Even so, the BBB received a total of 60 complaints about GIS.

Also, Defendant Jackson's emphasis on BBB complaints is misplaced. GIS had a customer service number that received fifty or more calls a day, many of them from consumers seeking refunds. GIS refunded $346,845.76 in 2004 and 2005, or eleven percent of its total gross sales. Jackson admits GIS sold grant information packages to approximately 27,000 customers; if refunds were provided to eleven percent of customers, then 2,970 customers received refunds. These figures do not account for consumers who were dissatisfied with their purchases, but who did not attempt to request refunds, like the consumers who testified at the show cause hearing.

### 2. Jackson Violated XI.A of the Permanent Injunction by Failing to Obtain Signed Acknowledgments

Paragraph XI.A of the Permanent Injunction required Jackson to obtain signed acknowledgments of receipt of the Permanent Injunction from all officers, directors, consumer service staff, sales personnel and consultants at any business where he was an officer, director or majority owner. Because Jackson was an

Case 3:01-cv-00170   Document 84   Filed 11/09/06   Page 30 of 42 PageID #: 1789

officer of GIS prior to April 21, 2004, and GIS was selling its grant materials in March 2004, Jackson violated Paragraph XI.A. by not obtaining acknowledgments of receipt prior to April 21, 2004.

    3.    *Jackson Violated XII.A of the Permanent Injunction by Failing to Truthfully Report the Nature of His Employment at GIS*

Paragraph XII.A of the Permanent Injunction required Jackson to notify the FTC of any changes in his employment status within ten days. Jackson violated Paragraph XII.A by not notifying the FTC that he was employed by GIS within ten days of his employment, or for that matter at any time during the operation of GIS. Jackson's first notice to Plaintiff that he had been employed by GIS occurred after the company had already stopped operating when he reported in June 2005 that he had been the registered agent of GIS from March 21, 2004, to July 31, 2004.

Jackson testified at the show cause hearing that he sent a letter to the FTC, dated June 15, 2004, notifying the FTC that he was the registered agent of GIS. The Court has found his testimony to be not credible. The FTC had no record of receiving Jackson's letter.

Even if the Court were to assume that Jackson sent the letter in question to the FTC, Jackson still would not have been in compliance with Paragraph II.A of the Permanent Injunction. Paragraph XII.A required Jackson to provide Plaintiff with a statement of his duties and responsibilities at GIS. Jackson knew he was the driving force behind GIS, yet he did not reveal this information to the FTC. Just two days after June 15, 2004, the

31

date he claims to have sent the letter to the FTC, Jackson sent a letter to GIS's landlord and signed it as the president of GIS. Other evidence clearly demonstrated Jackson's extensive control over GIS. As a result, the letter of June 15th did not accurately describe the extent of Jackson's duties and responsibilities at GIS.

> **4.** *Jackson Violated Paragraph XII.C of the Permanent Injunction by Failing to Report Truthfully the Nature of His Relationship with GIS When Asked to Do So by Plaintiff*

Paragraph XII.C of the Permanent Injunction required Jackson to submit written reports (under oath, if requested) to the FTC upon request relating to conduct subject to the Permanent Injunction. Pursuant to this paragraph, the FTC requested by letter that Jackson prepare a written report under oath explaining his relationship with GIS.

In his unsworn reply, Jackson stated that he had been the registered agent of GIS from March 21, 2004 to July 31, 2004, but he denied having been an officer, director or majority owner of the company. In fact, Jackson had been an officer of GIS. His false denial of that fact in his unsworn reply to the FTC's request constitutes a violation of the reporting requirement of Paragraph XII.C of the Permanent Injunction.

## C. Respondents Ortegon and GIS Acted in Concert with Jackson

Under Federal Rule of Civil Procedure 65(d), injunctions are binding on named parties and on "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert

32

or participation with them who receive actual notice of the order by personal service or otherwise." To establish actual notice, knowledge of the Permanent Injunction suffices. See Polo Fashions, Inc. v. Stock Buyers Int'l, Inc., 760 F.2d 698, 700 (6th Cir. 1985). Knowledge, like any other fact, can be proved through circumstantial evidence. Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001); Adcor Indus. v. Bevcorp, LLC, 411 F.Supp.2d 778, 800 (N.D. Ohio 2005)("[a]lthough the [respondents] may not have seen or read the Consent Decree, they certainly knew about it and its prohibition. . . . Overwhelming circumstantial evidence shows that they could not possibly have been ignorant of it.")

The FTC established through clear and convincing evidence that Ortegon, upon receiving actual notice of the existence and many of the terms of the Permanent Injunction, acted in concert and participation with Jackson in violating Paragraph II.A of the Permanent Injunction. Further, Ortegon served as an agent, servant, or employee of Jackson and/or GIS.

Defendant VGI employed Ortegon, who was at that time married to Jackson, and Ortegon knew the FTC sued Jackson and VGI for deceptive practices in 2001. During the initial litigation about VGI, the FTC deposed Ortegon. As a result of the litigation, VGI closed, causing the loss of Ortegon's job and Jackson's job. Thus, involvement with VGI was a substantial event in Ortegon's life. Although the FTC did not formally serve Ortegon with a copy of the Permanent Injunction because she was not a party to the litigation, she nonetheless had knowledge of it. She was aware of the entry of

33

the Permanent Injunction, and she now admits she knew at least some of its terms.

Even after their divorce and at Jackson's request, Ortegon resumed her maiden name and became the president and owner of GIS in July 2004 in order to hide Jackson's involvement in GIS. She admitted she knew Jackson asked her to do so because the BBB had posted on its website information about the VGI Permanent Injunction and information linking Jackson to GIS.

After becoming the president and owner of GIS, Ortegon was the public face of GIS. She conceded it was her job to insure that GIS operated lawfully. She signed documents for filings with state and local governments, and she signed banking documents and checks. Ortegon also acted as the conduit for thousands of dollars in cash taken from the GIS bank account and given to Jackson. Ortegon received a salary and paid off her car with GIS funds.

While serving as president of GIS and while employed in its offices from July 2004 until February 2005, over 100 employees of GIS signed receipts acknowledging the presence of the Permanent Injunction posted on the bulletin boards in the office. Ortegon admits she saw the Permanent Injunction posted on the bulletin boards, yet she did not sign a receipt acknowledging that she had seen it. Although Ortegon denies that she personally received a copy of the Permanent Injunction or read it, it is not reasonable for the Court to rely on her denial in the face of overwhelming evidence to the contrary. See Adcor Industries, 411 F. Supp.2d at 800. Having found that Ortegon had actual knowledge of the

34

Permanent Injunction and its provisions based on the clear and
convincing evidence presented, the Court concludes that Ortegon
participated in active concert with Jackson and GIS and that she
served as an agent, servant, or employee of Jackson and/or GIS.

GIS was the corporate vehicle controlled by Jackson throughout
its operation and through which Jackson misrepresented to consumers
the benefits of the grant information packages sold.  Thus, GIS
conducted itself in active concert with Jackson.  GIS had actual
notice of the Permanent Injunction through Jackson and Ortegon as
its officers and agents and through the posting of the Permanent
Injunction on its premises.  See City of Monroe Employees
Retirement Sys. v. Bridgestone Corp., 399 F.3d 651, 688 (6th Cir.
2005) (observing in securities fraud case that knowledge of
corporate officer or agent acting within scope of his authority is
attributable to corporation); Holt v. Southern Railway Co.,
51 F.R.D. 296, 299 (E.D. Tenn. 1969) ("the knowledge of all [the
corporation's] officers and agents was the knowledge of the
corporation").  Cf. FTC v. Bay Area Business Council, Inc.,
423 F.3d 627, 636-637 (7th Cir. 2005) (corporate owner and chief
executive officer was liable for deceptive acts practiced against
consumers in telemarketing scheme where owner and officer clearly
had knowledge of corporation's deceptive acts).

**D.   Civil Contempt Remedies**

*1.   Restitution and Disgorgement*

"District courts are afforded wide discretion in fashioning an
equitable remedy for civil contempt."  McGregor v. Chierco,

206 F.3d 1378, 1385 n.5 (11th Cir. 2000). Judicial sanctions may be imposed for either or both of two purposes: to coerce the defendant into compliance with the Court's order and to compensate the movant for the losses sustained. Gary's Elec. Serv., 340 F.3d at 379 (citing United States v. United Mine Workers of Am., 330 U.S. 258, 303-04 (1947)).

"Courts have regularly awarded, as equitable ancillary relief, the full amount lost by consumers. See, e.g., FTC v. Gem Merchandising Corp., 87 F.3d 466 (11th Cir. 1996) (affirming an award of damages as calculated by consumers' losses and an order of disgorgement to the Treasury); FTC v. Amy Travel Service, Inc., 875 F.2d [564] at 570 [(7th Cir. 1989)] (affirming restitution award of $6,629,100, the amount consumers paid for travel certificates)." F.T.C. v. Febre, 128 F.3d 530, 536 (7th Cir. 1997). In exercising its broad discretion in fashioning a remedy for civil contempt, the Court may order restitution to victims or disgorgement of profits to deprive the wrongdoer of his ill-gotten gain. Gem Merchandising Corp., 87 F.3d at 470. "Further, because it is not always possible to distribute the money to the victims of defendant's wrongdoing, a court may order the funds paid to the United States Treasury." Id. Individuals and corporate entities may be held jointly and severally liable for the total amount of consumer injury. FTC v. Think Achievement Corp., 144 F.Supp.2d 1013, 1019 (N.D. Ind. 2000), aff'd, 312 F.3d 259 (7th Cir. 2002).

"Proof of individual reliance by each purchasing customer is not a prerequisite to the provision of equitable relief needed to

36

redress fraud." <u>McGregor v. Chierico</u>, 206 F.3d 1378, 1388 (11th Cir. 2000) (citing <u>FTC v. Figgie Int'l, Inc.</u>, 994 F.2d 595, 605 (9th Cir. 1993)). "'A presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product.'" <u>Id.</u> (quoting <u>Figgie Int'l, Inc.</u>).

In this case Jackson, through GIS and with the assistance of Ortegon, misrepresented the central characteristic of the grant information packages. After reading the advertisements and hearing the telemarketing pitch, consumers were led to believe that their use of the materials GIS sold to them would make it highly likely that they would obtain a free government grant of at least $25,000 within 90 days. Only after paying in full for the grant information package and receiving it through the mail did consumers realize that the promised benefits were illusory. Not one consumer ever reported receiving a government grant after using GIS materials. Consequently, a fair measure of the injury done by Jackson, GIS and Ortegon through their violations of Paragraph II.A of the Permanent Injunction is the total amount of sales to consumers made by GIS, less any amounts previously returned to the victims in refunds. <u>See</u> <u>Think Achievement Corp.</u>, 144 F. Supp.2d at 1019; <u>FTC v. Wolf</u>, 1996 WL 812940 at *9 (S.D. Fla. 1996) ("The appropriate measure of restitution is the aggregate amount invested by customers, less refunds made by the defendants."); <u>FTC v. Renaissance Fine Arts, Ltd.</u>, 1995 WL 523619 at *2 (N.D. Ohio 1995)

("Generally, the appropriate amount of restitution in consumer redress cases is the full purchase price of the product, less refunds paid.").

Because the evidence shows that eleven percent of the gross sales of GIS were refunded, that amount will be deducted from total gross sales in determining the amount to be disgorged. Although Ortegon claims that she paid additional refunds from her personal bank account after GIS closed in early 2005, she did not provide any evidence of the amount of such refunds paid; therefore, the Court cannot include them in its calculations. Jackson, GIS and Ortegon are not entitled to a reduction in the amount ordered disgorged based on their other costs of doing business. See Febre, 128 F.3d at 536; Slimamerica, 77 F.Supp.2d at 1276 ("Costs incurred by the defendants in the creation and perpetration of the fraudulent scheme will not be passed on to the victims.").

In 2004, GIS generated $2,363,731.58 in net sales (gross sales less consumer refunds). In 2005, GIS generated $417,619.68 in net sales. Total net sales were thus $2,781,351.26.

Jackson admitted he received the profits from GIS in 2004, which were at least equal to $367,000. The evidence also proves that he received an additional $4,506 as his share of the refund from Intelephones in 2005, making the total he received at least $371,506. Jackson is individually liable for disgorgement in the amount of $371,506, payable to the U.S. Treasury.

Ortegon received from GIS's proceeds a salary of $21,000 and a pay-off on her personal automobile of $15,494 from her share of

38

the refund from Intelephones, for a total of $36,494. Ortegon is individually liable for disgorgement in the amount of $36,494, payable to the U.S. Treasury. Although the FTC contends Ortegon additionally should be held personally liable for over $300,000 for the cash she obtained by writing checks on the GIS account while she served as president, the uncontradicted evidence shows that she gave the cash to Jackson, who paid her a salary. Jackson admitted he took the profits from GIS in 2004. The FTC did not present any evidence showing that Ortegon took profits from GIS.

Subtracted from GIS's total net sales ($2,781,351.26) for the contempt period are the amounts for which Jackson ($371,506) and Ortegon ($36,494) are held personally liable for disgorgement. This leaves a total of $2,373,351.26, for which GIS and Jackson are jointly and severally liable for restitution, payable to the U.S. Treasury. See Think Achievement Corp., 144 F.Supp.2d at 1019.

Ortegon became president of GIS on July 21, 2004, and worked at GIS until it closed in February 2005. GIS made 20.8% of its gross sales prior to the date Ortegon became president, and 79.2% thereafter. Thus, Ortegon is jointly and severally liable with GIS and Jackson for 79.2%, or $1,879,694.20, of the total restitution amount of $2,373,351.26, payable to the U.S. Treasury.

GIS, Jackson and Ortegon, jointly and severally, must pay the restitution as ordered, and Jackson and Ortegon individually must pay the disgorgement as ordered to purge their civil contempt.

39

2.  *Modification of the Permanent Injunction*

The FTC seeks modification of the Permanent Injunction to permanently ban Jackson from participating in all aspects of telemarketing.  In direct support of its request for a lifetime telemarketing ban, the FTC cites only McGregor, 206 F.3d at 1386 n.9.  In that footnote, the Eleventh Circuit stated (emphasis added):

> Michael Chierico also appeals from Section III of the First Contempt Order which permanently enjoins him from "engaging or participating, whether directly or indirectly," in any capacity, in telemarketing as defined by the Final Judgment[.] . . . Contrary to Michael Chierico's contention, the permanent ban was not a contempt sanction, but a modification of Section II of the Final Judgment.  Section II's bond requirement and injunctive provisions were intended to ensure Michael Chierico's compliance with the law and protect consumers from further injury.  In light of Michael Chierico's continued fraudulent practices after the entry of the Final Judgment, the district court did not abuse its discretion in modifying Section II of the Final Judgment.

Like Chierico, Jackson continued to engage in deceptive telemarketing activity following entry of a permanent injunction.  To protect consumers from further harm the Court is tempted to impose on Jackson the lifetime ban on telemarketing the FTC requests, as such action appears to be warranted.

Unlike Chierico's Final Judgment, however, the Stipulated Final Judgment and Order for Permanent Injunction Against Defendants Vocational Guides, Inc., and Timothy Scott Jackson does not define "telemarketing," and the FTC has not provided the Court with any proposed language to adopt in modifying the Permanent Injunction previously entered by the Court.

40

As the FTC undoubtedly realizes, the definition of "telemarketing" can be very broad in scope, subject to litigation, and constantly changing. <u>See</u> <u>e.g.</u> <u>National Federation of the Blind v. FTC</u>, 420 F.3d 331 (4th Cir. 2005) (discussing definition of "telemarketing" in interpreting 1994 Telemarketing Consumer Fraud and Abuse Prevention Act and the FTC's Telemarketing Sales Rule promulgated thereunder); <u>Mainstream Marketing Servs., Inc. v. FTC</u>, 358 F.3d 1228, 1235 (10th Cir. 2004) ("There has been some confusion throughout this litigation with respect to how to define the term 'telemarketing.' *Compare* Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994 . . . (defining 'telemarketing' as calls 'conducted to induce purchases of goods or services') *with* <u>Mainstream Mktg. Servs., Inc. v. FTC</u>, 283 F.Supp.2d 1151, 1154 (D.Colo. 2003) (describing 'telemarketing' as the practice of 'soliciting sales and donations' conducted by businesses, charities, political organizations, and others."); <u>United States v. Schaefer</u>, 291 F.3d 932, 935 (7th Cir. 2002) (noting FTC Final Judgment and Order for Permanent Injunction broadly defined "telemarketing" as "any business that employed telephone presentations, 'either exclusively or in conjunction with the use of the mails or any commercial parcel delivery service.'").

While the Court may possess authority under Federal Rule of Civil Procedure 60(b)(5) to modify the terms of the Permanent Injunction in this case, the Court is not inclined to attempt to modify the Permanent Injunction, to which Jackson initially consented, to impose against Jackson a lifetime ban on

41

"telemarketing" when the Court has been provided with no guidance from the parties in defining the term and the scope of its meaning in the context of this case. Consequently, the request to modify the Permanent Injunction will be denied.

### III. CONCLUSION

Based upon all of the foregoing Findings of Fact and Conclusions of Law, the Court holds that Timothy Scott Jackson, Dora Helena Ortegon and GIS, Inc., must be held in civil contempt for failure to comply with provisions of the Stipulated Final Judgment and Order for Permanent Injunction Against Defendants Vocational Guides, Inc., and Timothy Scott Jackson.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

42