# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:01-0170** |
| | ) | **JUDGE ECHOLS** |
| **VOCATIONAL GUIDES, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The Federal Trade Commission ("FTC") filed a Motion for Order to Show Cause Why Timothy Scott Jackson and Grant Info Systems, LLC Should Not Be Held in Contempt (Docket Entry No. 92). No response to the motion was filed. The Court held a show cause hearing on January 8 and 9, 2009. Timothy Scott Jackson ("Jackson") appeared and ably participated in the show cause hearing *pro se* on behalf of himself and Grant Info Systems, LLC ("Grant Info").

At the completion of the hearing the Court asked the parties to submit proposed findings of fact and conclusions of law, and those filings are now before the Court. (Docket Entry Nos. 185 & 187.) Also pending are the FTC's Motion To Strike All Exhibits Accompanying Defendant Jackson's Pleading Filed March 9, 2009 (Docket Entry # 187) And Any Portions Of The Pleading Purporting To Rely On Them (Docket Entry No. 188), and the FTC's Motion To Modify The Stipulated Final Judgment And Order For Permanent Injunction (Docket Entry No. 97). Timothy Jackson did not file responses to either of these motions.

The FTC's Motion To Strike will be granted. Jackson submitted with his proposed findings of fact and conclusions of law a notebook containing numerous exhibits that were not admitted into

1

evidence at the show cause hearing. Although Jackson marked for identification a number of exhibits at the show cause hearing, none were received in evidence. Because his exhibits were not offered or admitted into evidence, they are not properly before the Court for consideration, and in making its ruling the Court will not rely on the defense exhibits or the arguments Jackson made in reliance on the exhibits in his proposed findings of fact and conclusions of law. The evidence in the case consists only of the testimony of the witnesses under oath and the FTC's exhibits that were admitted into evidence at the show cause hearing. Although Jackson presented a closing argument at the hearing, he was not sworn as a witness, and therefore, the Court will not accept as evidence any unsworn statements made by Jackson at the show cause hearing. The Court has considered Defendant Jackson's arguments based on the FTC's exhibits and the testimony, as well as his proposed findings of fact and conclusions of law.

The FTC requests that the Court enter an Order finding Jackson and Grant Info in civil contempt for their failure to comply with Section II.A of the Stipulated Final Judgment and Order for Permanent Injunction ("Final Order") entered by this Court on July 27, 2001. (Docket Entry No. 36.) As compensation to the consumers injured by the contempt defendants' violations of the Final Order, the FTC requests that Jackson and Grant Info be held jointly and severally liable for $7,644,069.20 – the gross revenues less refunds derived from their illicit activities. FTC v. Kuykendall, 371 F.3d 745, 764 (10th Cir. 2004) (contempt proceeding using gross receipts as starting point for damages award); FTC v. Vocational Guides, Inc., 2006 WL 3254517, at *17 (M.D. Tenn. 2006). The FTC further contends that, because the Final Order failed to achieve its original purpose, as evidenced by Jackson's continuing pattern of recidivism, the Court should enter a Supplemental Final Judgment and Order For Permanent Injunction As To Defendant Jackson ("Supplemental

2

Order"), pursuant to Federal Rule of Civil Procedure 60(b) and the Court's equitable jurisdiction. (Docket Entry No. 97.)  See United States v. United Shoe, 391 U.S. 244, 252 (1968) (modification appropriate where "decree has not . . . achieved its 'principal objects'"); Epic Metals v. Souliere, 181 F.3d 1280, 1283 (11th Cir. 1999) (same).

To the extent the parties' proposed findings of fact and conclusions of law are inconsistent with the Court's findings of fact and conclusions of law stated below, the parties' proposed findings and conclusions are hereby rejected.  The show cause hearing transcript is referred to as "HT," and the FTC's exhibits are referred to as "PX" followed by the exhibit number.

## I. FINDINGS OF FACT

## I.      THE CASE AND THE PARTIES

### A.      Prior Proceedings

1.      The FTC is a federal law enforcement agency founded by an Act of Congress.  15 U.S.C. §§ 41, *et seq.*  The Commission enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

2.      On July 27, 2001, pursuant to a complaint filed by the FTC under Section 5(a), the Court entered a Stipulated Final Judgment against Jackson and his company, Vocational Guides, Inc.  The complaint charged that defendants had engaged in a fraudulent marketing scheme involving the sale of examination and job placement assistance to consumers seeking employment with the United States Postal Service.

3.      Section II.A of the Final Order prohibited defendants from "misrepresenting the benefit of using . . . [a] good or service."  (Docket Entry No. 36 at 4.)

3

4.    On November 10, 2005, the Commission filed a motion for an order to show cause with accompanying memorandum and exhibits, alleging that Jackson, operating through a new company, GIS, Inc, had violated the Final Order by making false representations regarding the sale of purported grant assistance to consumers.  (Docket Entry Nos. 45-49.)

5.    On November 9, 2006, the Court found that Jackson and GIS, Inc. were in contempt of the Final Order.  (Docket Entry No. 84.)  On the same day, the Court issued an order holding Jackson individually liable for $371,506.00 and jointly and severally liable with GIS, Inc. for $2,373,351.26 in compensation to consumers. (Docket Entry No. 85.)

6.    On October 14, 2008, the FTC filed another motion for an Order to Show Cause with accompanying memorandum and exhibits, alleging that Jackson and yet another company, Grant Info, had violated Section II.A of the Final Order.  (Docket Entry No. 92.)  On October 21, 2008, the Court entered a temporary restraining order containing an asset freeze against Jackson and Grant Info.  (Docket Entry No. 103.)  On November 13, 2008, the Court entered a preliminary injunction against Jackson and Grant Info.  (Docket Entry No. 120.)

**B.    Timothy Scott Jackson**

7.    Notwithstanding his attempts to hide his involvement with Grant Info, at all times Jackson operated and controlled Grant Info.  Jackson covertly operated and controlled Grant Info from the time of its incorporation on May 15, 2005, until its sale to Altruis, LLC on October 1, 2007.  This includes the entire period of time during which the FTC contempt proceeding against GIS, Inc. was pending (November 10, 2005 - November 9, 2006) and an additional eleven months after the Court's November 9, 2006 decision that Jackson and GIS, Inc. violated Section II.A of the Final Order.

4

8.  Jackson has never applied for or received a grant. PX 46, Jackson Depo.at 40-42.[1] Jackson's first involvement with grants and the providing of grant assistance involved the two companies associated with this Court's November 2006 contempt decision – Grant Information Services, Inc. and its successor, GIS, Inc. Id. The first company listed Jackson's father, James O. Jackson, as its incorporator; the second company listed Jackson's ex-wife, Dora Ortegon, as its incorporator. In fact, Jackson held himself out as an officer of and controlled both companies. Vocational Guides, 2006 WL 3254517 at *3.

9.  Continuing the pattern of using family members as stand-ins, Grant Info listed Jackson's brother, James B. Jackson, as its incorporator. PX 21. However, the idea for forming the company was "mostly" Jackson's. PX 46 , Jackson Depo. at 43-44. Jackson supplied all of the startup money for the company. PX 45, Jimmy Jackson Depo. at 31-33.

10. Jackson conducted Grant Info's business from his residence, located at 209 Newton Nook in Brentwood, Tennessee, using personal assistants to perform various business related tasks on his behalf. PX 46, Jackson Depo. at 30-32. These tasks included making deposits and withdrawals from local banks in the Brentwood area, making payments to Grant Info's creditors, ordering supplies, maintaining spreadsheets containing sales records of Grant Info, and picking up and delivering items to Grant Info's business address, also located in Brentwood. PX 40, Calvello Depo. at 17; Depo. Ex. 2, ¶ 6; PX 43, Woodall Depo. at 13-14, 17-18. The assistants did their work in response to Jackson's explicit directions, frequently

---

[1] Jackson's deposition was entered into evidence, without objection, at the show cause hearing. At the start of the deposition, Jackson indicated his awareness of his Fifth Amendment privilege (Depo. at 4-5) and at various times asserted the privilege (e.g., Depo. at 35).

5

receiving daily chore lists describing what they were supposed to do on a given day. PX 43, Woodall Depo. at 13-14; PX 16, daily chore list.

11.     Jackson used a computer at his residence, which received a video and audio feed from the Grant Info business premises, to monitor the activities of Grant Info's sales personnel. PX 46, Jackson Depo. at 81-82.

12.     Jackson was in charge of Grant Info's advertising. PX 40, Calvello Depo. at 17 and Depo. Ex. 2, ¶ 9. Jackson placed ads for Grant Info's product in various small town newspapers and circulars. PX 46, Jackson Depo. at 85, citing PX 10, Att. A, ads placed with *American Classified.* Jackson's communications with these companies were by email, through the address, [jimbjack2006@yahoo.com,](jimbjack2006@yahoo.com) rather than an address using his own name. PX 46, Jackson Depo. at 73-74.

13.     All of the corporate accounts at the various banks at which Grant Info did business were in the name of Jackson's brother, Jimmy B. Jackson. PX 1, account opening documents; PX 46, Jackson Depo. at 121-122. However, as shown below, Jackson controlled all of the accounts of Grant Info throughout the time he was involved with the company.

14.     Jackson's brother, Jimmy, provided Jackson with blank signed checks for Grant Info's corporate accounts, as well as a facsimile signature stamp for use on unsigned checks. PX 45, Jimmy Jackson Depo. at 109, 113; PX 46, Jackson Depo. at 192-194; PX 40, Calvello Depo., Depo. Ex. 2, ¶ 13 (indicating that "shortly" after she began her employment in May 2006, Jackson began using the facsimile signature). The facsimile signature stamp was in Jackson's possession, and he was the only person with access to it. PX 45, Jimmy Jackson Depo. at 117; PX 46, Jackson Depo. at 193.

6

15.     Between July 27 and November 4, 2005, Jackson cashed at least 27 checks of $1,000 or more on Grant Info's corporate accounts, listing himself as the payee. The checks, all of which were signed by Jackson's brother, totaled $160,896. PX 5, Table, "Personal And Cash/Petty Cash Checks Cashed by Grant Information Systems Employees"; PX 9, sample checks listing Jackson as payee. Jackson placed some or all of the monies in a safe at his home at 209 Newton Nook in Brentwood. PX 46, Jackson Depo. at 171-172.

16.     After November 4, 2005, until at least the sale of Grant Info to Altruis in October 2007, Jackson made withdrawals from Grant Info's bank accounts using personal checks written to a series of personal assistants. PX 46, Jackson Depo. at 171-172, 185, 190, & 204; PX 40, Calvello Depo. at 17-18, citing Depo. Ex. 2, ¶¶ 10-16; PX 43, Woodall Depo. at 45-46, 53. Jackson's assistants also made withdrawals from banks at which Grant Info had corporate accounts, using checks made out to "Cash" or "Petty Cash." PX 46, Jackson Depo. at 196-200. The assistants took the cash from the bank withdrawals to Jackson, and he then put the money in a safe in his house. PX 46, Jackson Depo. at 171-172, 202-204; PX 43, Woodall Depo. at 45, 53.

17.     Jackson's personal assistants, Brittany Dye, Jilleen Calvello, Heather McMurray, and Danae Woodall, withdrew at least $1,789,764.00 from Grant Info's bank accounts using at least 379 personal checks of $1,000 or more. HT at 149-163 and PX 5. Between July 22, 2005 and September 28, 2007, at least $587,717.00 was withdrawn from Grant Info's bank accounts using checks of $1,000 or more made out to Cash/Petty Cash. HT at 159 and PX 5.

18.     Jackson paid for personal as well as business expenses with the monies he withdrew from Grant Info's corporate accounts. For instance, Jackson's assistant, Danae Woodall, testified

7

that whenever she needed to buy something for the household, Jackson supplied her with cash from his safe. PX 43, Woodall Depo. at 46-48. However, Jackson did not keep a ledger of cash flow to and from his personal safe. PX 46, Jackson Depo. at 203.

19. Notwithstanding his receipt and use of Grant Info's revenues, Jackson did not file tax returns for 2005, 2006, and 2007 – the three tax years during which he controlled the company. PX 46, Jackson Depo. at 34.

### C. Grant Info

20. Grant Info was incorporated as a for-profit company on May 15, 2005 and reincorporated as an LLC on June 2, 2005. PX 21, incorporation documents. The incorporator was Jimmy B. Jackson. Id.

21. Grant Info engaged in business from the location of 9005 Overlook Drive, Brentwood, TN 37027.

22. Jimmy Jackson received a salary of $200 per week throughout the time Grant Info was doing business. PX 45, Jimmy Jackson Depo. at 120-121.

23. On October 1, 2007, an entity doing business as Altruis, LLC and its owner, Troy D. Allen, purchased the assets of Grant Info, making an initial payment of $10,000 and an additional payment of $432,634.95. HT at 125-126; PX 23, sale documents.

## II. CONTEMPT DEFENDANTS' BUSINESS PRACTICES

### A. Overview of the Marketing of Grant Info's Program

24. Contempt defendants lured consumers by placing ads about their product in free local newspapers distributed throughout the United States. PX 10, Att. A, sample print ads. Consumers who responded to the 800 number in the ad were often placed on hold while they

8

listened to a greeting message containing additional representations about Grant Info's product. PX 36-37, transcripts of recordings. After the message, telemarketers attempted to sell Grant Info's product to consumers using a script provided by Grant Info. HT at 31-38; PX 44, Cude Depo. at 12; PX 33-35, transcripts of telemarketers' conversations with consumers.

25.     The marketing model Jackson used for Grant Info was virtually the same as the one he previously used for GIS, Inc. Cf. Vocational Guides, 2006 WL 3254517, at *4.

26.     The package Grant Info sold to consumers included a book called "Government Grant Catalog." The book contained a 226-page section titled, "Top 100 Government Programs," which purportedly listed information on government grant programs. PX 3. The package also contained two CDs titled "GIS Government Grants" and "Free Money Manual." PX 4a-b. Grant Info typically charged between $169.90 and $189.90 for the package, plus a $10 shipping fee. PX 11, sample complaints and refund requests; PX 41, Ewing Depo. Ex. 2, ¶ 3); PX 42, Maas Depo. Ex. 2, ¶ 3.

27.     The information in Grant Info's "Government Grant Catalog" was virtually identical to the catalog supplied to consumers by GIS, Inc. – Jackson's earlier company. HT at 143-146. In particular, the list of "Top 100 Government Grant Programs" was the same as an identically named list in the GIS, Inc. Catalog. HT at 144 & PX 3 at 3-38 thru 3-264 and PX 3a-67 thru 3a-296.[2]

---

[2]  The discrepancy in the number of pages between the two catalogs (226 versus 229) is a result of three extra pages in the GIS, Inc. catalog (3A-260- 3A-262) that were not part of the catalog and were inadvertently inserted in the FTC's exhibits.

9

## B. Representations Made in the Marketing of Grant Info's Program

28.     In selling the Grant Info program, Jackson and Grant Info represented that: (1) grants were available to individuals for "pretty much any good cause," including personal needs; (2) consumers were highly likely to receive grants worth thousands of dollars; and (3) Grant Info would provide post-purchase assistance to consumers who purchased its grant materials. As described in Section C, there was no basis for these representations.

### 1. Availability of Grants to Individuals for "pretty much any good cause," Including Personal Needs

29.     In their print ads, greeting message, and sales presentation, contempt defendants asserted that there was a huge supply of "free" money for "pretty much" any consumer need.

30.     Ads which contemnors ran in *American Classified* newspapers between June 2006 and October 2007 stated:

> **** **FREE CASH GRANTS!** $25,000++ **2006** NEVER REPAY! Personal/Medical Bills, Business, School/House. PX 10, Att. A.

> **** FREE CASH GRANTS/PROGRAMS! $700-$$800,000 **2007** Never Repay! Personal/Medical Bills, business, School/House. PX 10, Att. B.

31.     In their greeting message for consumers who called their 800 number, contempt defendants reaffirmed the message that there were grants for virtually any need:

> You, too, may qualify for cash grants for living expenses, including school, a new house, business, or any of the 900 grant programs offered by the 26 Federal grant-making agencies.

PX 36.

32.     Building on the representations in the print materials and greeting, as shown below, the script and the sales presentation of contempt defendants' telemarketers emphasized to

10

consumer that there existed a huge supply of grants for individuals, regardless of the consumer's needs.

33.     Defendants' sales script instructed telemarketers to ask what city and state the consumer was calling from and then indicate that Grant Info's materials were showing "a number of programs available." PX 25. This included grants "for housing, rent, personal bills, school, a new business, or pretty much for any good cause . . . " Id. Although the script required telemarketers to ask consumers why they needed the grant, id., in fact, according to testimony of Grant Info's telemarketers, the consumers' answers were irrelevant. Unless the consumer was from the State of Tennessee – the state from which Grant Info did business – telemarketers always told consumers that there were grants available for their particular needs. HT at 38-39; PX 44, Cude Depo. at 14, 17. Other than the contents of the package they sold to consumers, the telemarketers had no other sources of information available to check for available grants or on which to base their answers. HT at 38-39; PX 44, Cude Depo. at 42.

34.     Defendants' representations about the availability of grants for individual needs or "pretty much any good cause" are reflected in transcripts of recorded conversations between Grant Info sales personnel and consumers. PX 33 at 33-5 ("There is money available for housing, rent, personal bills, school, or starting a new business, or pretty much for any good cause"); PX 35 at 35-7 (same).

35.     Defendants' representations about the availability of grants for individual needs or "pretty much any good cause" are also reflected in the testimony of consumer witnesses. PX 41,

11

Ewing Depo. at 14 & Depo. Ex. 2, ¶¶ 3-4 (grants available for roof repairs); PX 42, Maas Depo. at 10-11 & Ex. 2, ¶ 3 (grants available to purchase agricultural land for grandson).

### 2. Likelihood of Receiving a Grant

36.    In their print ads, greeting, and sales presentation, Jackson and Grant Info also emphasized that it was highly likely consumers who purchased their program would receive free grants.

37.    Many of the print ads stated that "Almost Everyone Qualifies" for grants.  PX 10, Atts. A and B.

38.    Grant Info's sales script instructed telemarketers to tell consumers who did not have funds to purchase the materials, or did not want to purchase the materials, that "[a]lmost everyone qualifies for a number of grants."  PX 27.

39.    Grant Info's telemarketers were instructed to give prospective customers the impression that it was "very likely" they would receive a grant if they purchased Grant Info's package.  HT at 42 (Palmer told to create impression that "[A]lmost no one who used our package did not receive a grant."); PX 44, Cude Depo. at 25 (sales pitch designed to give consumers "false hope" they would get grant money") and 27 ("I believe . . . their [the consumers'] first impression of it [the package] is that there's a very likely chance they would get the money.").

40.    Grant Info consumers were told that residents in the consumer's city and state "do qualify for a number of programs available."  PX 27.  Grant Info telemarketers testified that they actually did not look to see if there were grants available where the consumer lived and had no way to determine if grants were available where the consumer lived.  HT at 38; PX 44, Cude Depo. at 13.

12

41. Grant Info scripts included the limited qualifications that "not all grants are guaranteed" (PX 27) and that Grant Info could not attest to the likelihood of a consumer receiving a "specific grant." PX 25. However, some telemarketers told consumers they were guaranteed to get a $25,000 grant within 90 days. PX 44, Cude Depo. at 25-26.

42. Jackson's and Grant Info's representations about the likelihood of consumers receiving grants for their individual needs are reflected in transcripts of recorded conversations between Grant Info sales personnel and consumers. PX 33 at 33-10 ("[L]ike I said, $49 billion is left there . . . It's grant money. The grant money is available for whenever the U.S. citizens or taxpayers need it for school, housing, starting a business, or whatever it might be."); PX 34 at 11-12 ("I'm telling you right now, you will – you will get money.").

43. Jackson's and Grant Info's representations about the likelihood of consumers receiving grants for their individual needs is corroborated by the testimony of consumer witnesses who were promised or guaranteed they would receive a grant for their individual needs. PX 41, Ewing Depo. at 14 & Ex. 2 ¶¶ 3-4; PX 42, Maas Depo. at 10-11 & Ex. 2 ¶ 3.

### 3. Post-Purchase Assistance

44. As part of their presentation, Grant Info's telemarketers routinely told customers that Grant Info had a customer service department which would provide them with post-purchase assistance. HT at 51; PX 44, Cude Depo. at 43.

45. Grant Info's scripts stated: "When you receive your application package we will show you exactly how to apply . . ." and "...what we do is show you step by step how to submit copies of applications and proposals to the right agencies." PX 25 & 27.

13

46. In addition, a question and answer sheet to assist telemarketers in answering consumer questions, stated:

> **"13. Is the same Grant Information available at the library?**
>
> > No, they usually have outdated books regarding Grant Information . . . Plus, we offer our clients the opportunity to talk with a real person if they have any questions.
>
> **14. Is the same Grant Information available on the Internet?**
>
> > Some grant information is available but no one-on-one interaction is available . . .[Y]ou cannot get specific answers to specific questions."

PX 24, emphasis in original.

47. Testimony of consumer witnesses indicates that Grant Info's telemarketers represented to them that they would receive post-purchase assistance. PX 41, Ewing Depo. at 14-15 ("I was told [to] call any time and they'd be glad to help."); PX 42, Maas Depo. at 11 & Ex. 2 ¶ 4.

### C. The Contempt Defendants' Representations Were False or Misleading

48. Each of the three representations described in § II.B.1-3 above were false or misleading.

#### 1. Grants Are Not Available to Individuals for Pretty Much Any Good Cause, Including Personal Needs.

49. FTC expert, John Etcheverry, testified that Jackson's and Grant Info's representation that grants are available to individuals for pretty much any good cause, including personal needs, was false. Mr. Etcheverry's testimony affirmed and amplified statements he had made in a declaration which was submitted at an earlier stage of this proceeding. HT at 59 & PX 38.

14

50. Etcheverry is the Director of Grants Systems Modernization in the Office of Grants for the United States Department of Health and Human Services ("HHS"). One of his duties is to oversee HHS's Grants.Gov Program – an online listing of federal grant making agencies and their programs. HT at 54 & PX 38 ¶ 1.

51. Etcheverry testified that the vast majority of federal grants are awarded to education and research institutions, state and local government entities, Native American Tribes, and not-for-profit organizations, rather than to individuals. HT at 64-65; PX 38 ¶ 4. In particular, he testified that data he found on the morning of his testimony (January 8, 2009) indicated that only seven (7) out of 549 open grants were available to individuals. HT at 60. (In his declaration, prepared six months earlier, Etcheverry stated that he found 12 individual grants out of 454 open grants. PX 38 ¶ 5). Mr. Etcheverry testified additionally that grants are provided for a public purpose rather than personal needs such as putting a new roof on an applicant's house, or repairing an applicant's car. HT at 67,77 & PX 38 ¶ 4.

52. The materials in Grant Info's consumer package did not list individual grants for personal needs, as promised in the representations of the company's telemarketers. For instance, in the 226-page list of 100 Top Government Grant Programs in Grant Info's catalog, only 17 were open to individuals and of these, none involved personal needs. HT at 64-65. The remaining 83 programs were a mixture of loan programs or grant programs directed to entities such as government organizations and not-for-profit groups, rather than individuals. Id.

15

### 2. There was Virtually No Likelihood Grant Info's Customers Would Receive a Grant Using the Company's Materials.

53.    Etcheverry's testimony likewise indicates that Jackson's and Grant Info's representations about the likelihood of receiving a grant are false.

54.    Etcheverry testified that grants are competitive because the "vast majority of times" there are more applicants and requests for funds than available funds. As a result not all applicants who qualify for a grant are selected. HT at 66 and PX 38 ¶ 8. In addition, there are situations where no applicants receive grant awards because of the applicants' failure to meet the grant's eligibility requirements. HT at 67. Etcheverry estimated that a fourth of the inquiries received by the call center of Grants.gov involved individuals who mistakenly believed there were federal grants for personal items such as those described as grant worthy by Grant Info's telemarketers – for instance, putting a new roof on a house. Id.

55.    The business experience of Jackson and Grant Info indicates they were well aware that consumers who used their materials were not likely to receive a grant. Although the script used by Grant Info's telemarketers explicitly invited consumers to "call us back to let us know how you do," PX 25, Jackson could not identify any instance in which one of his customers actually received a grant PX 46 at 229-230, notwithstanding his estimate that Grant Info had 52,000 customers. PX 46, Jackson Depo. at 234. Grant Info telemarketers and the customer service representative responsible for fielding all post-purchase inquiries from consumers who purchased the Grant Info materials also testified that they knew of no individual receiving a grant using the Grant Info materials. HT at 49; PX 44, Cude Depo. at 28.

16

56. The testimony of Etcheverry and FTC investigator, Ronald Lewis, also shows that the materials Grant Info sold contained outdated information and therefore was of no value to consumers.

57. Lewis testified that the 226-page list of "Top 100 Government Programs" in Grant Info's catalog was identical to the list in the GIS, Inc. Catalog. HT at 143-146; PX 3 & PX 3a. Since GIS, Inc. ceased doing business in February 2005, Vocational Guides, 2006 WL 3254517 at *8, the information in the Grant Info list dates back to at least that date.

58. Etcheverry testified that grant program requirements and forms change every year and sometimes multiple times during the year. HT at 87. Thus, the information in Grant Info's catalog was out of date for virtually all of the time Grant Info was doing business. HT at 88. In addition, an important form in the Grant Info Catalog – the SF 424 – the cover sheet for most federal grants, HT at 70 – was outdated because it had been produced in 2003 and had been revised several times since that date. HT at 72; PX 38 ¶ 11.

59. Etcheverry and former Grant Info employee, John Tyler Cude, also testified that Grant Info's "Free Money Manual" CD contained outdated information.

60. Etcheverry testified that the "Free Money Manual" CD was largely a list of addresses and contact information for state and local agencies, much of it for counseling rather than grants. HT at 79-80. Etcheverry also testified that in many cases the CD listed a department, office, or division of an office, but did not say what each did. Id. Finally, Etcheverry indicated that when he attempted to call three random phone numbers listed in the CD, one did not answer, another was a wrong number, and the third was a different party than the one listed. HT at 79.

17

61.  Cude testified, based on his work experience in Grant Info's customer service department, that "in my opinion it [the "Free Money Manual" CD] was kind of like giving [consumers] the run-around." PX 44, Cude Depo. at 52. Cude explained that most of the phone numbers and names in the "Free Money Manual" CD were not valid. Id. He said that the CD itself stated, "This material is out of date." Id.

### 3. Contempt Defendants Misrepresented Their Customer Assistance Program.

62.  According to Jackson, none of the managers associated with Grant Info's telemarketing operation had any background in grants or grant procurement. PX 46, Jackson Depo. at 227.

63.  Jackson also testified that Grant Info sold a "self-help package" and that it was "pretty much up to the individual [consumer] how hard they want to work to find the grants." PX 46, Jackson Depo. at 228. As for Grant Info's customer service department, Jackson agreed with the characterization that it was unable to provide any assistance that went beyond the "four corners" of the package delivered to consumers. PX 46, Jackson Depo. at 227.

64.  Jackson admitted that the script used by his telemarketers did not explain adequately that his product was a self-help package. PX 46, Jackson Depo. at 231 ("[T]here should have been more details in the script."); Id. at 233 ("[W]e could have done a better job on that."). He also testified that the script language telling consumers Grant Info would show them "exactly how to apply for grants" was "not good." Id. at 231-32.

65.  John Tyler Cude, who was hired as a telemarketer in February 2007 and worked in customer service from June or July 2007 until the time Grant Info was sold, confirmed that contempt defendants were unable to provide the assistance they promised to consumers. PX 44, Cude Depo. at 42-52, 58-59.

18

66. Cude had no background in grants and received no training when he was hired as a telemarketer, PX 44, Cude Depo. at 57-58, or when he switched to the customer service department. Id. at 45. He worked in customer service alone, received 60-90 calls on a busy day, and estimated that he was unable to return 10-30 of them. Id. at 48.

67. Based on his work experience, Cude stated, "[The] customer service that was available was poor." Id. at 42. Cude asserted additionally, "all our customer service could do is point them [the consumers] in the right direction. I mean, we couldn't hold their hand, and walk them through it." Id. at 44. Cude stated that the predecessors in his job were also unable to provide appropriate customer assistance and, as a result, "despised" their jobs. Id. at 58. He testified, "[T]here wasn't really . . . a lot of help that we were offering." Id. at 59.

68. FTC expert, Etcheverry, further underscored the implausibility of Jackson's and Grant Info's assistance representations. Etcheverry testified that the process of applying for a grant is complex and requires a significant degree of technical expertise. HT at 73-74 & PX 38 ¶ 9. Persons who furnish grant assistance typically have expertise in the workings of a single federal agency such as Homeland Security, Education, or Transportation, and in some cases expertise in only a part of the agency's mission. HT at 73-75. When he was asked whether he would have concerns about a company such as Grant Info, which stated it could supply assistance to *any* grant applicant, Mr. Etcheverry stated, "I don't know how it could be done." HT at 75.

69. Consumers who purchased Grant Info's product testified that the company did not provide them with any assistance. For instance, when customer Lauren Ewing telephoned Grant Info for assistance in filling out grant application forms, a customer service representative refused

to help him and told him it was his responsibility to figure out how to use the materials.  PX 41, Ewing Depo. at 14-15 & Ex. 2 ¶¶ 3,6.  Consumer Alvin Maas was unable to reach anyone when he called Grant Info's customer service number.  PX 42, Maas Depo. at 11-12 & Ex. 2 ¶ 4.

### 4. Jackson Admitted that the Usefulness of Grant Info's Product was "Very Debatable."

70.    On July 13, 2007 and, again, on July 16 – twenty-six (26) months after Grant Info began operating – Jackson received an email from a Grant Info manager named Jason Greene describing his concerns about Grant Info's business practices.  HT at 116-118; PX 17 & 18.

71.    Among other things, Greene stated:

> Just between you and me, **I think we all know that this product and our representation of this product is misleading to an extent.**  We are targeting individuals in the lower income class in penny saver ads promising free money for rent and bills.  There are thousands of legitimate grants that anyone can apply for but we all know that a large percentage of them are for very specific purposes with very specific eligibility requirements . . . **There is probably a small percentage of people this product will work for and will be completely satisfied.  As for everyone else, it [*sic,* it's] almost like we send it out the door knowing it is not going to work for them and hope they are too lazy to return it.**

(PX 17 & 18, emphasis added.)

72.    Jackson's reply to the email stated, among other things:

> Jason, we appreciate your thoughts and feelings.  **The usefulness of our product is very debatable.**

(PX 15 at 15-8, emphasis added.)

Jackson then instructed Greene to continue adhering to a policy which provided refunds to complaining customers "so no more complaints get filed with BBB [ Better Business Bureau] or any agency that monitors operations such as ours."  PX 15 at 15-9.

20

### III. CONSUMER COMPLAINTS ABOUT GRANT INFO'S MISREPRESENTATIONS

73.  According to former employees of Grant Info, numerous consumers complained about Grant Info's product.

74.  Kalii Palmer testified that all of the after-sale calls she received from customers during the time she was a Grant Info telemarketer were complaints. HT at 48. She testified additionally: "Ultimately I got another job . . .Obviously, the caller complaints played a big part in that. I began to realize this wasn't exactly what I believed it was; and morally, I could no longer stay." HT at 49. Cude estimated that he would receive 10-15 consumer complaints per eight-hour shift during the time he worked as a telemarketer for Grant Info. PX 44, Cude Depo. at 18.

75.  Cude testified that many of the calls he received in Grant Info's customer service department consisted of complaints about Grant Info's product. PX 44, Cude Depo. at 47-52. According to a document prepared by Cude, the top two categories of complaints against Grant Info were:

> "Can't find a program they [consumers] qualify for after being told that there definitely [were] programs for them."

> "Upset that no one can tell them exactly what programs they qualify for."

Id. at 51-52; PX 12.

76.  The customer complaint categories described by Cude are reflected in refund requests maintained in Grant Info's business records. PX 11. For example, one refund request stated, "Totally confusing. Could find nothing that I could relate to what I needed . . . Not of any value to me." PX 11-3. Another read, "We were under the impression that we could be

21

helped - step-by-step - That did not happen." PX 11-9. Yet another stated: "The book was very outdated and I just think that this was a [waste] of time and money." PX 11-16.

## IV. CONSUMER INJURY CAUSED BY CONTEMPT DEFENDANTS' VIOLATIONS OF SECTION II.A OF THE FINAL ORDER; JACKSON'S ASSETS

### A. Contempt Defendants' Revenues From Grant Info's Sales

77. Business Tax Act License and Tax Reports filed by Grant Info with the State of Tennessee during the time Jackson controlled the company show that, after deducting refunds, contempt defendants made a total of **$7,644,069.20** from their sales during the period between July 1, 2005 and September 30, 2007. PX 28-30.

78. The **$7,644,069.20** of sales revenues were distributed as follows: (1) for July 1, 2005 thru June 30, 2006: $2,777,646.08, PX 28; (2) for July 1, 2006 thru June 30, 2007: $4,078,361.68, PX 29; and (3) for July 1, 2007 thru September 30, 2007: $788,061.64. PX 30.

79. The settlement sheet for the sale of Grant Info to Altruis, LLC indicates that the principal of Altruis, Troy Allen, paid a total of **$442,634.95** for the assets of Grant Info, consisting of an initial payment of $10,000 and an additional payment of $432,634.95 on October 1. HT at 126; PX 23.

80. Jackson received at least $255,089.94 of the sale money, pursuant to bank routing instructions he supplied, using his brother's name, to an agent of the escrow company. PX 46, Jackson Depo. at 237-238, referring to portion of PX 23 cited as Depo. Ex. 13; PX 45, Jimmy Jackson Depo. at 89-92. Although Jackson asserted that a substantial portion of the sales monies were for expenses related to Grant Info, he produced no evidence to support this assertion. PX 46, Jackson Depo. at 242 & Ex. 15.

22

**B.** **Jackson's Assets**

81. In the sworn financial disclosure statement which Jackson prepared pursuant to the Court's temporary restraining and preliminary injunction orders, he stated that he had no accounts at a financial institution, or real estate. PX 46, Jackson Depo. Ex. 2 Items 12-14. He listed the following property items, which he valued at a total of $161,262: (a) a 2004 Cadillac Escalade SUV; (b) a 2006 Mercedes SLK 280; (c) personal property, including a home theater and a piano; and (d) office furniture. PX 46, Jackson Depo. at 13-19 & Ex. 2, items 20-21 and attached property list.

82. Although Jackson alleged that title to the Cadillac Escalade is in the name of his father, James O.Jackson, he testified that he purchased the car with his own funds and monies furnished by GIS, Inc. – the company which was the subject of the Court's 2006 contempt decision. PX 46, Jackson Depo. at 13-14. Jackson alleged that the purchase price of the Cadillac was $39,000 and that there are no loans outstanding on the car. Id. at 15 & Ex. 2, Item 21. In addition, Jackson admitted using the Cadillac. Id. at 14.

83. With respect to the 2006 Mercedes SLK 280, although title is allegedly in the name of Jackson's wife, Jennifer Gregory, Jackson testified that he purchased the car in 2006, that he paid $36,000, and that there are no loans outstanding on the car. PX 46, Jackson Depo. at 15 & Ex. 2 Item 21. Jackson testified that he received, pursuant to an undocumented verbal agreement with his now wife, 17 monthly $650 cash payments. Id. at 15-16. He stated that he placed the payments in a safe in his house, id. at 16, and these funds were co-mingled with cash taken from Grant Info bank accounts.

84. Jackson did not file tax returns for 2005, 2006, and 2007 – the three years during which he controlled and was receiving cash from Grant Info's revenues. PX 46, Jackson Depo. at 34.

## II. CONCLUSIONS OF LAW

### I. THE COURT HAS THE AUTHORITY TO HOLD JACKSON AND GRANT INFO IN CONTEMPT

#### A. Jurisdiction and Venue

1. The Court has jurisdiction over the subject matter of this case as well as the parties pursuant to Section XIII of the Final Order ("Retention of Jurisdiction").

2. Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) & (c).

#### B. Legal Standard for Civil Contempt

3. District courts have the inherent power to enforce their orders through civil contempt. Shillitani v. United States, 384 U.S. 364, 370 (1966). As a party to the original action, the FTC may invoke the Court's power by initiating a proceeding for civil contempt. Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 444-445 (1911).

4. Civil contempt is established by clear and convincing evidence that: (1) the party had knowledge of the court order; and (2) the party failed to comply with a definite and specific court order. Electrical Worker's Pension Trust Fund v. Gary's Elec. Serv. Co., 340 F.3d 373, 379 (6th Cir. 2003); Rolex Watch USA v. Crowley, 74 F.3d 716, 720 (6th Cir. 1996).

5. Third parties, such as Grant Info, are subject to an injunctive order when they are "in active concert or participation with [a party]" and "receive actual notice of [the order] by personal service or otherwise." Fed R. Civ. P. 65(d)(2).

24

## II.    JACKSON AND GRANT INFO ARE IN CONTEMPT OF § II.A OF THE FINAL ORDER

### A.    The Final Order, Including the Injunctive Provision in Section II.A, is Definite and Specific.

6.    Section II of the Final Order states:

> "Defendants, in connection with the marketing, offering for sale, or sale of any good or service are hereby permanently restrained and enjoined from:
>
> A.  Misrepresenting the benefit of using the good or service."

7.    This Court held in its 2006 contempt ruling that the Final Order, including the injunctive provision in Section II.A, was a definite and specific court order. Vocational Guides, 2006 WL 3254517 at *12.

### B.    Jackson and Grant Info Violated Section II.A of the Final Order.

#### 1.    Overview

8.    Jackson and Grant Info made each of the three representations described in ¶¶ 28-47 above.

9.    Each of the three representations was false and misleading.

#### 2.    Jackson's Contumacious Conduct

##### a.    Jackson's Knowledge of the Final Order

10.    Jackson had knowledge of the Final Order because he signed it.  Docket Entry No. 36 at 17.

11.    Jackson's knowledge of the Final Order is apparent from his participation in the earlier contempt proceeding in this case, which involved, among other things, the same provision of the order – Section II.A – that is now at issue in this proceeding.

##### b.    Jackson's Violations of the Final Order

12.    Jackson controlled Grant Info, acting as its *de facto* owner and operator.  He formed the company; managed and monitored its operations, including its sales force; placed its print

25

ads; and controlled its finances.  See ¶¶ 7-18 above.  Because of his control of Grant Info, he is responsible for the three false representations concerning the benefits of the company's program which are at issue in this contempt proceeding.  FTC v. Amy Travel Service, Inc., 875 F.2d 564, 573 (7th Cir. 1989) (Liability established by showing "that the individual defendants participated directly in the practices or acts or had authority to control them.")

>    **(1)** **Grants Are Not Available to Individuals for Pretty Much Any Good Cause, Including Personal Needs.**

13. Grants are typically awarded to institutions, government bodies, and private groups.  They are rarely awarded to individuals and, in any event, are not available for many of the personal needs described by Grant Info's customers.  ¶ 51 above.

14. In addition, the information in contempt defendants' own materials belies their claims that numerous individual grants were available for personal needs.  According to the testimony of John Etcheverry, only 17 of the Top 100 Government Grant Programs in the Grant Info catalog were open to individuals and, of these 17, none involved personal needs.  Of the remaining 83 programs many involved loans rather than grants.  As for the programs that involved grants, these concerned entities such as research organizations and not-for-profit groups, rather than individuals.  ¶ 52 above.

>    **(2)** **Customers Who Used the Grant Info Program Were Not Likely To Receive a Grant.**

15.  Grant awards are often competitive because there are more applicants than available funds.  In addition, applicants may not meet the eligibility requirements of a grant.  As a result, not all applicants to a grant program are likely to receive grants.  Indeed, there are instances where no applicants receive grants.  ¶ 54 above.

26

16.  Apart from the difficulties that applicants face in obtaining grants, much of the package sold by Grant Info contained outdated information. For instance, the 226-page list of the top 100 Government Grants in Grant Info's catalog was identical to a list in the catalog of GIS, Inc. – Jackson's predecessor company which was the subject of the Court's 2006 contempt decision. ¶ 57 above. Much of the information in Grant Info's "Free Money Manual" was also outdated. ¶¶ 60-61 above.

17.  Despite a request in Grant Info's sales script to "call us back to let us know how you do," no Grant Info customers reported receiving grants. ¶ 55 above. In fact, many Grant Info customers complained about the difficulty in finding grants. ¶¶ 75-76 above.

18.  Although Jackson admitted in his deposition testimony that he was unaware of any of his customers receiving grants, ¶ 55, Grant Info's telemarketers continued to represent to consumers that the Grant Info materials would make it likely they would receive a grant. ¶¶ 36-40, 42 above.

19.  Jackson was aware of the problems involving his product. In response to an email from one of his managers describing the representation of the product as "misleading to an extent," Jackson replied that "The usefulness of our product is very debatable." ¶¶ 71-72 above.

### (3) Grant Info Did Not Provide Post-Purchase Assistance to Help Consumers Obtain Grants.

20.  Grant Info's customer service department was understaffed, and its representatives had no background in grants, or reference materials to guide them when they spoke to customers. ¶¶ 65-67 above. Moreover, because of the volume of phone calls, many calls went unanswered. ¶ 66 above.

21.    Underscoring Grant Info's failure to provide post-purchaser assistance, Jackson admitted at his deposition that the company's program was "just a self-help package . . . with the information in it provided for them [consumers] to use on their own. ¶ 63 citing PX 46, Jackson Depo. at 227. If a customer wanted information that went "beyond the four corners" of the Grant Info package, there was no way for Grant Info's staff to supply it. ¶ 63 citing PX 46, Jackson Depo. at 228.

### 3.    Grant Info's Contumacious Conduct

22.    Because Jackson was Grant Info's *de facto* principal and controlled the company, his knowledge of the Final Order and the subsequent, 2006 contempt decision of this Court is imputed to Grant Info. <u>Vocational Guides</u>, 2006 WL 3254517 at *17, citing, <u>inter alia</u>, <u>City of Monroe Employees Retirement Sys. v. Bridgestone Corp.</u>, 399 F. 3d 651, 688 (6th Cir. 2005) and <u>Holt v. Southern Railway Co.</u>, 51 F.R.D. 296, 299 (E.D. Tenn. 1969).

23.    Grant Info was the corporate vehicle, operated and controlled by Jackson, which made deceptive representations to consumers. ¶¶ 7, 9-18, and 20-22 above.

24.    Since Grant Info had knowledge of the Final Order and conducted itself in active concert with Jackson in violating Section II.A, it is likewise in contempt. <u>Vocational Guides</u>, 2006 WL 3254517 at *17.

### C.    <u>The Defenses of Contempt Defendants Are Without Merit.</u>

### 1.    Representation that grants are not guaranteed

25.    Although Jackson's and Grant Info's scripts may have included the qualification that some or all grants are not guaranteed, PX 25 & 27, the "net impression" conveyed to consumers by Grant Info's advertisements and telemarketers was that they were likely or virtually

28

certain to receive a grant if they purchased the company's program. Accordingly, the "not guaranteed" disclaimer in the script is insufficient to rebut the misrepresentation about the likelihood or certainty of obtaining a grant. <u>FTC v. Think Achievement</u>, 144 F. Supp. 2d 993, 1010 (N.D. Ind. 2000) ("The important criterion in determining the meaning of an advertisement is the net impression that it is likely to make on the general populace."), *aff'd* 312 F.3d 259 (7th Cir. 2002); <u>FTC v. Peoples Credit First, LLC</u>, 2005 WL 3468588 at *5 (M.D. Fla. 2005) (material misrepresentations regarding purported credit card held determinative despite presence of limiting language), *aff'd* 244 Fed. Appx. 942 (11th Cir. 2007), 2007 WL 2071712 (citing <u>Removatron Int'l Corp. v. FTC</u>, 884 F.2d 1489, 1496 (1st Cir. 1989)).

26. The "no guarantee" *caveat* in the script was buried in a series of upbeat pronouncements about the easy availability of grant money. ¶ 33 above. Affirming this, former Grant Info telemarketer, Kalii Palmer, stated that she was told to give consumers the impression "that almost no one who used our [Grant Info's] package did not receive a grant." ¶ 39 above. Another salesman, John Tyler Cude, testified that the sales pitch of Grant Info was designed to give consumers the "false hope" they would get grant money. ¶ 39 above. Cude stated additionally that some Grant Info telemarketers were in fact telling consumers that grants were guaranteed. ¶ 41 above.

27. Consumers and recordings of Grant Info sales presentations to consumers confirm that consumers were told they were likely to receive a grant. ¶ 43 above.

29

### 2. "Guaranteed" Refunds

28.  The argument that "offering a money-back guarantee somehow makes the falsity of an advertisement irrelevant," has already been rejected in this Court's 2006 contempt decision. Vocational Guides, 2006 WL 3254517 at *14 (citing Think Achievement Corp., 312 F.3d at 261 ("[no] one would buy something *knowing* that it was worthless and that therefore he would have to get a refund of the purchase price." (emphasis in original).

29.  The refund guarantee was predicated on an assumption that the majority of consumers who were deceived by Jackson's and Grant Info's practices would not complain. Indeed, one of Grant Info's managers stated in an email, "[W]e sent it [the package] out the door knowing it is not going to work for them and hope they are too lazy to return it." ¶ 71 above. As the Court stated in its 2006 contempt ruling, "These [refund] figures do not account for consumers who were dissatisfied with their purchases, but who did not attempt to request refunds[.]" Vocational Guides, 2006 WL 3254517 at *14. Moreover, the refunds did not eliminate the underlying deception problem which gave rise to this contempt proceeding. Think Achievement, 144 F.Supp. 2d at 1010.

### 3. Purported Lack of Consumer Complaints

30.  Repeating a defense he advanced in the 2006 contempt proceeding, Jackson again suggests that a purported lack of consumer complaints against Grant Info shows that it was a legitimate business. Jackson alleges there were 17 Better Business Bureau complaints against Grant Info out of 52,000 customers. Cf. Vocational Guides, 2006 WL 3254517 at *14. In fact, the testimony of Cude indicates that Grant Info's customer service department was receiving as many as 90 calls per day, that Cude was unable to return many of the calls,

and that of the ones he did return many were complaints about Grant Info's product. ¶¶ 66, 75 above. In addition, Grant Info's telemarketers also received numerous complaint calls. ¶ 74 above.

31. Even if a large number of consumers did not complain to the BBB, as the Court has recognized in its 2006 decision, this does not mean Jackson and Grant Info have complied with the Final Order's requirement that they refrain from marketing practices that misrepresent the benefits of a good or service. <u>Vocational Guides</u>, 2006 WL 3254517 at *14, (citing <u>United States v. Lasseter</u>, 2005 WL 1638375 at *4 (M.D. Tenn. 2005) ("[F]ailure by consumer victims to file a complaint with the FTC does not indicate that the Defendant has complied with the [FTC] Act.")); <u>see also</u> <u>Amy Travel Service, Inc.</u>, 875 F.2d at 572 ("The existence of some satisfied customers does not constitute a defense under the FTCA.").

### 4. Advice of Counsel

32. Although Jackson maintains that he consulted with two local attorneys to obtain legal advice about how to run Grant Info in a legitimate manner, Jackson did not produce any testimony or move into evidence any documents establishing that he retained attorneys to review Grant Info, that he disclosed all relevant facts to his counsel about the operations of Grant Info, and that he relied on counsel's advice.

31

## III. THE COURT HAS AUTHORITY TO ORDER ALL RELIEF NECESSARY TO COMPENSATE CONSUMERS INJURED BY CONTEMPT DEFENDANTS' VIOLATIONS OF THE FINAL ORDER.

### A. The Court Holds Jackson and Grant Info Liable for $7,644,069.20 to Compensate Injured Consumers.

33. District courts have broad discretion in fashioning civil contempt remedies. McGregor v. Chierco, 206 F.3d 1378, 1385 n.5 (11th Cir. 2000). This includes requiring a party found in civil contempt to compensate those injured by the contempt. Garrison v. Cassens Transport Co., 334 F.3d 528, 543 (6th Cir. 2003); In re Jaques, 761 F.2d 302, 305-306 (6th Cir. 1985); Electrical Workers Pension Trust Fund of Local Union #58, 340 F.3d at 379.

34. As this Court recognized in its 2006 decision, its broad discretion to compensate injured consumers can be based on the gross receipts of Grant Info. Vocational Guides, 2006 WL 3254517 at *17 (citing FTC v. Gem Merchandising Corp., 87 F.3d 466, 470 (11th Cir. 1996)). See also, FTC v. Kuykendall, 371 F.3d 745, 764 (10th Cir. 2004) ("When . . . the FTC has shown through clear and convincing evidence that defendants were engaged in a pattern or practice of contemptuous conduct, the district court may use the defendants' gross receipts as a starting point for assessing sanctions."); FTC v. Febre, 128 F.3d 530, 535-536 (7th Cir. 1997) (damage award based on full amount of consumer losses).

35. Contempt defendants Jackson and Grant Info are jointly and severally liable for all proceeds received through the operation of the Grant Info program. Think Achievement Corp., 144 F.Supp. 2d at 1012-1013. Based on public filings with the State of Tennessee, the proceeds, less refunds, amount to **$7,644,069.20.** ¶ 78 above; cf. Vocational Guides, 2006 WL 3254517 at *19.

32

**B.** **The Court Requires Contempt Defendants To Turn Over to the FTC or its Designated Agents Automobiles and Other Identified Assets Listed by Jackson in his Personal Financial Statement, Prepared Pursuant to the Preliminary Injunction Order (Docket Entry No. 120).**

36.     The Court has authority to order Jackson and Grant Info to turn over specific assets in fulfillment of its monetary judgments.  See FTC v. Affordable Media, LLC, 179 F.3d 1228, 1242-1244 (9th Cir. 1999) (affirming order requiring contempt defendants to repatriate and turn over funds in an overseas asset protection trust).  The Court also has authority to order Jackson to turn over personal property held in his name and the name of others, including Dora Helena Ortegon, who was previously found in contempt in connection with GIS.  FTC v. Pacific First Benefit, LLC, 472 F. Supp. 2d 981, 986 (N.D. Ill. 2007) (ordering third parties to turn over defendants' assets).

37.     The Court's order in this contempt proceeding requires a turnover of certain property assets listed by Jackson in the financial statement he submitted to the FTC on November 21, 2008, pursuant to Section II.A of the Preliminary Injunction Order (Docket Entry No. 120).   In particular this includes: (a) a 2004 Cadillac Escalade SUV; (b) a 2006 Mercedes SLK 280; and (c) all of Jackson's personal property and office furniture, some of which is held with Dora Helena Ortegon.  PX 46, Jackson Depo. Ex. 2, Items 20 and 21 and Appendix.

38.     Although Jackson has testified that his father, James O. Jackson, is the registered owner of the 2004 Cadillac Escalade SUV, he admitted that he purchased the vehicle with his funds and funds from GIS, Inc., his first fraudulent government grant operation, and that he is using the vehicle.  PX 46, Jackson Depo. at 13-14.

39.     Although Jackson testified that his current wife, Jenny Gregory Jackson, is the registered owner of the 2006 Mercedes SLK 280, he admitted that he purchased the vehicle with his

33

money.  Id., at 15.  Since Jackson admitted that he filed no tax returns from at least 2005-2007 (id. at 34) and invoked the Fifth Amendment with respect to any other questions involving his income or taxes (id. at 34-35), the Court draws an adverse inference that Jackson paid for the Mercedes with cash from Grant Info's corporate bank accounts.  Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); Sentinel Trust Co. v. Namer, 172 F.3d 873 (6th Cir. 1998) (table), 1998 WL 887287 at *2.

40.    Jackson alleges that, pursuant to a purported agreement, his wife made 17 monthly payments of $650 toward the purchase of the car and that he put the payments in a safe in his house.  ¶ 83 above.  However, there is no factual support for these assertions.  The purported agreement between Jackson and his wife was verbal rather than "formally written," id. at 16; her alleged payments to him were all in cash, id. at 15; and Jackson had no ledger for monitoring the cash flow to and from his safe.  ¶ 18 above.  Thus, Jackson's self-serving contention that his wife made payments for the Mercedes lacks credibility.  In addition, the seventeen alleged payments ($11,050.00) are substantially less than the $36,000.00 Jackson admitted paying for the Mercedes, or the $29,400.00 he claimed it was worth at the time he completed his personal financial statement.  PX 46, Jackson Depo. Ex. 2, Item 21.

41.    The Court has the authority to apply state law equitable doctrines to provide equitable monetary relief.  See Think Achievement, Corp., 144 F. Supp. 2d at 1020; FTC v. Crittenden, 823 F. Supp. 699, 703 (C.D. Cal. 1993), aff'd 1994 U.S. App. LEXIS 3910 (9th Cir. 1994).

34

42.  Under Tennessee law, the automobiles are available as assets to be liquidated, for the benefit of consumers, under the equitable theory of "constructive trust" preventing unjust enrichment.

43.  In Tennessee, courts have long recognized that "[e]quity regards that as done which in good conscience ought to be done.'" McCann Steel Co. v. Third Nat. Bank, 337 S.W. 2d 886, 891 (Tenn. Ct. App. 1960); Holt v. Holt, 995 S.W. 2d 68, 77 (Tenn. 1999). In so holding the courts have created a constructive trust avoiding unjust enrichment where a party holds "'legal title to property which he ought not, in equity and good conscience hold and enjoy.'" Rowlett v. Guthrie, 867 S.W. 2d 732, 734 (Tenn. Ct. App. 1993) (quoting Livesay v. Keaton, 611 S.W. 2d 581, 584 (Tenn. Ct. App. 1980)). In Holt, the Tennessee Supreme Court held that, notwithstanding the legal title holder being an innocent titleholder and having performed no bad act, where a court order had been violated, public policy creates a constructive trust in the property held by the legal titleholder. Id. at 77.

44.  Jackson purchased expensive automobiles with proceeds obtained in violation of the Court's initial Final Order, with respect to the Cadillac, and the Final Order and subsequent November 9, 2006 contempt finding and attendant $2.7 million dollar judgment, with respect to the Mercedes. Although the Escalade is registered in his father's name and the Mercedes is registered in his wife's name, to vindicate this Court's Orders, the automobiles are deemed held in constructive trust for the benefit of defrauded consumers regardless of James O. Jackson's or Jenny Gregory's culpability. See id.

35

45.     In the alternative, the automobiles are available under Tennessee law as assets to be liquidated, for the benefit of consumers, under the equitable theory of "resulting trust" preventing unjust enrichment.

46.     In Tennessee, an equitable "resulting trust" can arise where circumstances of consideration involved in a transaction so dictate. Rowlett, 867 S.W. 2d at 735. A resulting trust arises at the time of purchase when the payment is made by the beneficiary of the trust, and the:

> underlying principle of all resulting trusts is the equitable theory of consideration. That theory is that the payment of a valuable consideration draws to it the beneficial ownership; that a trust follows or goes with the real consideration, or results to him from whom the consideration actually comes; that the owner of the money that pays for the property should be the owner of the property. Pomeroy's Eq. Jur. (5th ed.), secs 981, 1031, 1037; 2 Lawrence on Eq. Jur. (1929 ed.), sec. 565.

> Livesay, 611 S.W.2d at 584.

47.     With a resulting trust, it is indispensable that the payment be made by the beneficiary. Id. Jackson's own testimony identifies his full payment for the vehicles at the time of purchase. ¶¶ 82-83 above. To the extent Jackson's conduct did not create a constructive trust on behalf of defrauded consumers, Jackson has a resulting trust in the automobiles and the automobiles are part of Jackson's assets available for consumer redress.

48.     This Court has the authority to use its inherent powers, including orders to non-parties, to fashion effective relief. FTC v. Productive Marketing, Inc., 136 F. Supp. 2d 1096, 1106 (C.D. Cal. 2001). In Productive Marketing, the court ordered the turnover of defendant's assets held by a third party as "necessary to achieve the purposes" of the court's order - providing redress to "consumers who have been defrauded by Defendants." Id. Similarly, in this instance, the Court orders Jenny Gregory, James O. Jackson, and Dora Helena Ortegon to turn over Jackson's assets held by them.

36

## III.  CONCLUSION

For all of the reasons stated, the Court will enter the FTC's proposed Contempt Order finding Timothy Scott Jackson and Grant Info Systems, LLC in civil contempt for violating Section II.A of the Final Order and holding them jointly and severally liable for $7,644,069.20 in consumer injury. In addition, because the Final Order has failed to achieve its purpose, the Court will enter separately the FTC's proposed Supplemental Order banning Jackson from telemarketing, prohibiting him from participating in any business connected with grant procurement, and permitting additional compliance monitoring by the FTC.

Appropriate Orders will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

37